**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| The Polly Hagee Insurance Trust, by its trustee, Kathy Kay Hagee Rudkin; The Gerald D. Hagee Insurance Trust, by its trustee, Polly Hagee; The Gregory Todd Lawley Irrevocable Life Insurance Trust, by its trustee, Audrey Ratner; on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOLDEN GATE PRIVATE EQUITY, INC., NASSAU FINANCIAL GROUP, L.P., and NASSAU INSURANCE GROUP HOLDINGS, L.P.<br><br>Defendants. | Civil Action No. 3:26-cv-1674<br><br>JURY TRIAL DEMANDED |

# CLASS ACTION COMPLAINT

Plaintiffs, Kathy Kay Hagee Rudkin, in her capacity as trustee and on behalf of the Polly Hagee Insurance Trust; Polly Hagee, in her capacity as trustee and on behalf of the Gerald D. Hagee Insurance Trust; and Audrey Ratner, as trustee of the Gregory Todd Lawley Irrevocable Life Insurance Trust; individually and on behalf of all other similarly situated persons (collectively "Plaintiffs"), bring this Class Action Complaint against Defendants Golden Gate Private Equity, Inc. ("Golden Gate"), Nassau Financial Group, L.P. ("Nassau Financial"), and Nassau Insurance Group Holdings, L.P., f/k/a Nassau Reinsurance Group Holdings, L.P. ("Nassau Holdings," collectively with Nassau Financial, "Nassau"), and allege as follows:

## INTRODUCTION

1. For years, families timely paid premiums to PHL Variable Insurance Company ("PHL") for life insurance policies purchased for security and protection. Today, no matter how much coverage they bought or how faithfully they paid, these families will receive no more than $300,000. This loss was not an unavoidable business failure. It was the foreseeable and intended result of a scheme perpetuated by private-equity Defendants to take control of PHL, interfere with Plaintiffs' existing contracts, extract PHL's assets for their own benefit, and leave policyholders with the shortfall.

2. PHL's parent company, The Phoenix Companies, Inc. ("Phoenix"), had been operating since 1851 as a prominent life insurer. It survived the Civil War, both Great Depressions, both World Wars, the Cold War, and the Great Recession. It could not survive private-equity greed.

3. Defendants acquired PHL and Phoenix in 2016 after promising Connecticut regulators and policyholders that they would preserve PHL, strengthen its finances, and honor its existing contracts. They did the opposite. Defendants systematically and callously pillaged PHL's assets by using PHL's money to finance their own ventures, buy back roughly $1 billion of PHL-issued stranger-originated life insurance policies through shell companies, collect hundreds of millions of dollars in fees and dividends, and transfer more than $2 billion through captive reinsurance arrangements—including offshore entities they controlled. Defendants then obscured the damage through undisclosed affiliate transactions and sham reinsurance that made PHL appear healthier than it was to avoid regulatory scrutiny.

4. By May 2024, Defendants' shell game collapsed. PHL entered rehabilitation unable to pay claims as they came due, and the benefits payable under Plaintiffs' policies were capped at $300,000. The named Plaintiffs bring this action on behalf of thousands of similarly situated

policyholders. Defendants turned a once reputable insurer built to protect families into a source of private profit—and left those families to absorb the loss.

## PARTIES

5. Plaintiff, the Polly Hagee Insurance Trust, by its trustee, Kathy Kay Hagee Rudkin, is a citizen of Texas, and is the owner and beneficiary of a universal life policy no. 97600447 that was issued by PHL for $2,000,000 in coverage in 2006, insuring the life of Polly Hagee (the "Polly Hagee Policy").

6. Plaintiff, the Gerald D. Hagee Insurance Trust, by its trustee, Polly Hagee, is a citizen of Texas, and is the owner and beneficiary of a universal life policy no. 97600445 that was issued by PHL for $1,000,000 in coverage in 2006, insuring the life of Polly Hagee (the "Gerald Hagee Policy," collectively with the Polly Hagee Policy, the "Hagee Policies").

7. Plaintiff, the Gregory Todd Lawley Irrevocable Life Insurance Trust, by its trustee, Audrey Ratner, is a citizen of Pennsylvania, and is the owner and beneficiary of a universal life policy no. 97501236 that was issued by PHL for $2,000,000 in coverage in 2011, insuring the life of Gregory Todd Lawley (the "Lawley Policy").

8. Defendant Golden Gate is a private equity firm organized and existing as a corporation under the laws of Delaware and is headquartered at One Embarcadero Center, 39th Floor, San Francisco, California 94111. Golden Gate is a citizen of Delaware.

9. Defendant Nassau Holdings is a limited partnership organized and existing under the laws of Delaware and is headquartered at One American Row, Hartford, Connecticut, 06103. Nassau Holdings is a citizen of Delaware, as Defendant Golden Gate is its ultimate owner.

10. Defendant Nassau Financial is a limited partnership organized and existing under the laws of the Cayman Islands and is headquartered at One American Row, Hartford, Connecticut, 06103. Nassau Financial is a citizen of Delaware, as Defendant Golden Gate is its ultimate owner.

## JURISDICTION AND VENUE

11. This Court possesses subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2)(a) because this is a class action in which the aggregate claims of all members of the proposed class (as defined below) exceed $5,000,000, exclusive of interests and costs; there are over 100 members of the putative class; and the citizenship of the Plaintiffs and one or more members of the class differs from the citizenship of any Defendants.

12. This Court also may exercise jurisdiction over this civil action under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because this civil action arises under the laws of the United States, and Plaintiffs are alleging a cause of action for violation of its rights under Title IX of the Organized Crime Control Act of 1970, as amended, 18 U.S.C. §§ 1961, *et seq*.

13. Furthermore, this Court may exercise supplemental jurisdiction over the related state-law claims in this civil action under 28 U.S.C. § 1367(a) because all other claims are so related that they form part of the same case or controversy.

14. This Court has general personal jurisdiction over Nassau Financial and Nassau Holdings because they are headquartered in Hartford, Connecticut.

15. This Court has specific personal jurisdiction over Golden Gate pursuant to Conn. Gen. Stat. § 52-59b(a). Golden Gate transacted business within this District by forming, operating, and funding Nassau with a principal place of business located at One American Row, Hartford, Connecticut, 06103 (the "Connecticut Headquarters"). Through Nassau, Golden Gate acquired PHL, a Connecticut-based insurer, and paid the entire acquisition cost, as described below. During the acquisition process, Golden Gate made actionable misrepresentations directly to the Connecticut Insurance Department and its officials, employees, and agents in Hartford, Connecticut, as described herein.

16. Golden Gate regularly conducts and solicits business, engages in a persistent course of conduct, and derives substantial revenue from goods and services from the Connecticut Headquarters through Nassau and Nassau's related subsidiaries, over which Golden Gate exerts direct control. Golden Gate's Founder, Managing Director, and Chief Information Officer, David Dominik, is the "ultimate controlling person" of Nassau and all of its related subsidiaries listed on Exhibit 1,[1] all of which Defendants employed in their scheme to funnel PHL's assets to Nassau and Golden Gate, as described herein. Specifically, Nassau, PHL Delaware LLC, PHL, DSM Sands LLC, Westgate Delaware LLC, Concord Re, Inc. ("Concord Re"), and Palisado Re, Inc. ("Palisado Re") all operated from the Connecticut Headquarters at Golden Gate's direction and control at all relevant times in this Complaint.

17. Moreover, Golden Gate, through its agents, caused the formation of two Connecticut-based reinsurers, Concord Re and Palisado Re, in order to further Defendants' scheme through sham reinsurance, as described below.

18. This Court also has personal jurisdiction over Defendant Golden Gate pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1965(b). At least one RICO defendant, Nassau Holdings and/or Nassau Financial, resides, is found, has an agent, or transacts its affairs in this District and is subject to personal jurisdiction here. Accordingly, this Court may exercise personal jurisdiction over all other RICO defendants, including Golden Gate, where the ends of justice require that such defendants be brought before a single court in a single action.

19. The ends of justice require the exercise of personal jurisdiction over Golden Gate because Plaintiffs' RICO claims arise from a single, integrated scheme involving Golden Gate,

---

[1] Exhibit 1 represents the basic structure of the Enterprise, subject to the corporate structure changes and the creation of entities noted in this Complaint. *See, e.g.*, *infra* note 3; ¶¶ 68, 92, 122, 148.

Nassau, PHL, and related entities. Golden Gate exercised control over Nassau, directed and participated in the conduct of the RICO enterprise, and engaged in coordinated conduct with Nassau that caused injury to Plaintiffs and the putative class. Requiring Plaintiffs to pursue identical RICO claims against Golden Gate in a separate jurisdiction would create a substantial risk of inconsistent judgments, duplicate proceedings, inefficiency, and unnecessary expense.

20. Moreover, Golden Gate purposefully directed conduct at Connecticut by creating, capitalizing, controlling, and operating Nassau through its Connecticut headquarters, acquiring and operating PHL, communicating with Connecticut insurance regulators, and participating in transactions and decisions affecting a Connecticut-domiciled insurer. Golden Gate therefore had fair warning that it could be required to defend claims in Connecticut arising from that conduct.

21. In addition, because Plaintiffs assert claims under RICO, which provides for nationwide service of process under 18 U.S.C. § 1965(b), and because the exercise of jurisdiction over Golden Gate is consistent with due process, this Court may exercise personal jurisdiction over Golden Gate based upon its contacts with the United States as a whole.

22. Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391 because, as set out in further detail below, Nassau's principal place of business is in Connecticut, Golden Gate both formed Nassau in Connecticut and intended to conduct business through Nassau in Connecticut, and the litigation concerns life insurance policies issued by a Connecticut-based insurer subject to the laws and insurance regulations of Connecticut.

23. There is an actual controversy between the parties, which is ripe for judicial resolution. The Policies at issue in this case prescribe death-benefit payment amounts in excess of the $300,000 cap imposed by the Superior Court of Connecticut pursuant to the petition submitted

by the Connecticut Insurance Commissioner, but are now subject to the cap as a direct result of Defendants' successful efforts to drain PHL's assets.

## FACTS COMMON TO ALL CLAIMS

### I. DEFENDANTS' COVERT PATH: FROM PILLAGE TO PROFIT

24. As detailed herein, Defendants harmed Plaintiffs by misrepresenting and omitting material facts to the Connecticut Insurance Department and Plaintiffs, pillaging PHL assets, and then concealing PHL's true financial condition by failing to disclose related party transactions and implementing circular sham reinsurance. Defendants' conduct, described below, led to the demise of the once-reputable insurer.

25. *First*, Defendants misrepresented and omitted material facts to the Connecticut Insurance Department (the "Department"), the public, and Plaintiffs to fraudulently obtain Department approval and induce continued premium payments for their direct benefit. Defendants acquired PHL and portrayed themselves to Connecticut regulators as committed, long-term owners who would recapitalize PHL, preserve its existing insurance operations, avoid material adverse operational changes, and implement strategies intended to strengthen the insurers and reduce risk. That was not true. Through these misrepresentations and material omissions, Defendants induced the Department's approval to allow their acquisition of PHL, implemented material and adverse changes to PHL's operations, and induced Plaintiffs to continue to pay premiums.

26. *Second*, Defendants pillaged PHL's assets for their direct benefit and at the expense of policyholders, including Plaintiffs. Starting in 2016 and over the course of nearly a decade, Defendants collected Plaintiffs' premium and, at the same time, were secretly draining PHL's assets by causing PHL to: (i) purchase $1 billion of stranger-originated life insurance ("STOLI") policies that PHL had previously issued—by way of a sham loan that was never repaid—and to pay the death benefits on such STOLI policies to Defendants' subsidiaries for the benefit of

Defendants; (ii) invest hundreds of millions of dollars of PHL assets into dubious financial vehicles and investments created and owned by Defendants; (iii) use sham reinsurance to funnel over $2 billion dollars of PHL assets to Defendants' captive reinsurers that were unable (or unwilling) to pay PHL's policyholder liabilities as they became due; and (iv) use PHL assets to pay themselves large and improper dividends.

27. *Third*, Defendants concealed PHL's true financial condition to avoid regulatory scrutiny and prolong its scheme to defraud by: (i) failing to properly disclose intercompany transactions and related investments as affiliated transactions on PHL's financial statements; and (ii) fraudulently inflating PHL's books through circular sham reinsurance and illegal accounting arbitrage. Defendants' conduct caused PHL to overstate its financial condition by over $1 billion, as subsequently determined by the Connecticut Insurance Commissioner.

28. In sum, Defendants' deceptive conduct caused Plaintiffs to lose a substantial portion of their life insurance benefits.

**A. THE RISE AND FALL OF PHOENIX AND PHL.**

29. Phoenix was a Hartford, Connecticut-based financial services and life insurance firm established in 1851.

30. Phoenix's wholly-owned subsidiary, PHL, was founded in 1981 as a full-service insurance company selling a variety of insurance products, including term life-insurance policies, whole life-insurance policies, fixed annuities, and universal life-insurance policies ("UL Policies" or, individually, a "UL Policy").

31. UL Policies are a flexible insurance product. They allow policyholders to adjust premium payments within a certain range to keep the policies in force. While a minimum payment is required on UL Policies, premiums paid over the minimum payment can decrease the risk of

lapse and increase the policy's cash value, which the policyholder can access through policy loans or other withdrawals.

32. A significant component of the minimum payment required on a UL Policy is the cost-of-insurance ("COI") component, which covers the cost of providing the death benefit and the insurer's administrative fees.

33. In the early 2000s, the flexible nature of UL Policies was particularly attractive to institutional investors who, for their own investment purposes, procured and funded thousands of multi-million-dollar UL Policies (including an especially large number of PHL policies) on elderly insureds who they did not know and who neither wanted nor needed insurance. These policies became known as stranger-originated life insurance, or "STOLI." In most jurisdictions, including Connecticut, STOLI policies are illegal human-life wagers. *See, e.g.*, Conn. Gen. Stat. Ann. § 38a-465j (prohibiting "entry into any practice or plan that involves stranger-originated life insurance").

34. As this Court has recognized, "[a] STOLI policy differs from a regular policy in that it is obtained not for estate planning purposes but for transfer to an investor with no insurable interest in the life of the insured. '[E]ssentially, it is a bet on a stranger's life.'" *United States v. Carpenter*, 190 F. Supp. 3d 260, 264 (D. Conn. 2016) (quoting *United States v. Binday*, 804 F.3d 558, 565 (2d Cir. 2015), *aff'd sub nom. United States v. Bursey*, 801 F. App'x 1 (2d Cir. 2020)).

35. PHL initially priced its UL Policies on the assumption that (i) they would be taken out by legitimate policyholders who would pay significantly more than the minimum payment in order to take advantage of the cash value investment features offered by the UL Policies, and (ii) a certain percentage of the UL Policies would lapse without requiring any payment by PHL. However, neither assumption applied to STOLI policies.

36. Instead, the institutional-investor owners of these STOLI policies paid only the minimum premium required to keep the policies in force and, accordingly, did not allow the policies to lapse. As a result, these STOLI policies constituted a sizeable, unprofitable block of business for PHL, which made PHL financially vulnerable.

37. In addition, in April 2010, PHL announced a COI rate increase applicable to many of these investor-owned STOLI policies. And in 2011, PHL announced a second COI increase applicable to similar UL Policies with typical STOLI characteristics.

38. In November 2011 and October 2014, two class-action lawsuits were filed against Phoenix and PHL in the Southern District of New York related to the 2010 and 2011 COI increases ("COI Litigations"). They were captioned: *Fleisher v. Phoenix Life Ins. Co.*, No. 11-cv-8405 (SDNY 2011), and *SPRR v. PHL Variable Ins. Co.*, No. 14-cv-8714 (SDNY 2014).

39. Soon thereafter, Phoenix took steps to market itself and PHL for sale.

## B. DEFENDANTS' STOLI DECEPTION: THE INTER-CONNECTED PURCHASE OF PHOENIX AND SETTLEMENT OF THE COI LITIGATIONS.

40. In April 2015, Golden Gate created Nassau with an initial capital contribution of $750 million for the purpose of acquiring Phoenix and PHL. Golden Gate appointed Nassau's executive[2] and leadership team: Phil Gass and Kostas Cheliotis. Golden Gate and Nassau entered into a partnership to maximize short term gains by draining PHL assets at the expense of PHL policyholders.

41. At the time, Phil Gass touted "[w]e are very pleased to have partnered with Golden Gate as we look to build a dynamic platform with insurance, reinsurance and asset management

[2] As used herein, the term "executive" means the companies' leadership team and/or the persons responsible for making decisions on behalf the company.

business." Golden Gate's founder, David Dominik, added "we are very pleased to be partnering with Phil Gass and Gus Cheliotis…[who have] a compelling track record…"

42. On May 1, 2015, Nassau signed a non-disclosure agreement in connection with acquiring Phoenix and PHL. And on May 12, 2015, Nassau submitted a preliminary indication of interest to Phoenix and PHL to acquire the companies for a price between $37 and $43 per share.

43. Immediately thereafter, Phoenix and PHL took action to settle the COI Litigations.

44. On May 29, 2015, Phoenix and PHL filed motions to obtain preliminary approval of a settlement agreement in the COI Litigations. On August 19, 2015, the parties in the COI Litigations filed motions for final approval of the settlement agreement. On September 9, 2015, the Southern District of New York approved the settlement agreement.

45. Most notably, Phoenix and PHL agreed to settle the COI Litigations on the condition that Phoenix and PHL not challenge the validity of PHL's large and unprofitable block of STOLI policies. In other words, Phoenix and PHL agreed that they would not refuse to pay death benefits in the future on the ground that the policies in question were illegal STOLI policies. This rendered Phoenix and PHL defenseless when institutional investors sought to collect the benefits from their illegal STOLI policies—the very policies that had made PHL financially vulnerable in the first place.

46. Discovery will likely demonstrate that this settlement condition was driven, in large part, by Nassau and Golden Gate. More so, discovery will likely show that Defendants engineered the forfeiture of Phoenix's and PHL's rights to challenge their illegal STOLI policies so that Defendants could purchase many of these STOLI policies on the open market and obtain the benefits for themselves, without risk of carrier challenge. Nassau and Golden Gate called this the Buyback Program, which is described *infra* Section I.D.

### C. DEFENDANTS' ACQUISITION OF PHOENIX & PHL: DECEPTIVE PROCESS RIDDLED WITH MISREPRESENTATIONS AND OMISSIONS.

47. After settlement of the COI Litigations, Nassau finalized its acquisition of Phoenix and PHL for $217.2 million. The Connecticut Insurance Commissioner approved the acquisition on May 5, 2016. The acquisition cost was paid entirely by Golden Gate on or about June 20, 2016. Discovery will likely demonstrate that the acquisition cost was paid via interstate wire transfer from Golden Gate in California to PHL in Connecticut.

48. During the acquisition process of Phoenix and PHL and certainly after the acquisition, Golden Gate and Nassau knew the scope of PHL's contractual relationships—particularly, PHL's portfolio of active insurance products, which included Plaintiffs' policies.

49. During their acquisition of Phoenix and PHL, Golden Gate and Nassau made several, material misrepresentations and omissions to Plaintiffs and to the Connecticut Insurance Commissioner regarding their plans for PHL, portraying themselves to Connecticut regulators as committed, long-term owners who promised to revitalize Phoenix and PHL, preserve their existing operations, and implement necessary strategies to *reduce* risk. Nothing could have been further from the truth.

50. For example, on March 15, 2016, Golden Gate and Nassau filed their amended and restated Form A Application, along with 10 supporting exhibits, in which Defendants represented that (i) Nassau and Golden Gate had no plans to liquidate any of PHL's assets or to merge or consolidate any of those assets with any person or persons or to make any other material change in PHL's business operations or corporate structure or to enter into material agreements, arrangements, understandings or transactions of any kind with any party, and (ii) after the transaction was complete, Nassau and Golden Gate intended to operate PHL in a manner similar to how PHL was operated in the past. None of these representations were true.

51. To the contrary, Defendants intended to make material changes to PHL's corporate structure by forming a handful of shell entities to operate the Buyback Program and deploy a scheme of circular sham reinsurance, discussed *infra*.

52. Defendants also did not intend to operate PHL as it had been operated in the past. Instead, Defendants planned to intentionally raid PHL and its assets—contributed over years by policyholders like Plaintiffs—to the detriment of policyholders through: (i) the Buyback Program; (ii) risky financial investments; (iii) sham reinsurance; and (iv) exorbitant, improper dividends paid to themselves.

53. Following the filing of the amended Form A application, on March 18, 2016, the Connecticut Insurance Commissioner issued a notice of public hearing on Golden Gate's and Nassau's acquisition of PHL. The notice was published in print in Connecticut and on the Connecticut Secretary of State's website.

54. On April 19, 2016, Nassau and Golden Gate provided written and oral testimony in connection with a public hearing and again misrepresented their intentions in the following ways, among others:

(i) Nassau CEO and co-founder, Phil Gass, provided testimony that Nassau intended to operate Phoenix and PHL in a manner similar to how Phoenix and PHL was operated previously, which was false, as illustrated by Defendants' intentions to pillage PHL to create profit for themselves;

(ii) Phil Gass also confirmed the accuracy of Nassau's "Capital Management Plan" which represented to the Connecticut Insurance Commissioner that Nassau committed to making a $100 million capital contribution to be used *solely to support the insurance operations*

*of Phoenix and PHL*, which was false, as demonstrated by the Buyback Program which funneled money away from PHL and to Defendants' subsidiaries; and

(iii) Phil Gass and Golden Gate's General Counsel, Stephen D. Oetgen, provided testimony that Nassau had no immediate plans to make any other material change to Phoenix's or PHL's business operations or corporate structure or management, which was also false, as highlighted by the creation of multiple sham entities to fuel Defendants' deceptive schemes.

55. Based on Defendants' misrepresentations, the hearing officer in Connecticut found that there were no material plans or proposals for PHL that were unfair and unreasonable to Plaintiffs or not in the public interest. The hearing officer's findings of fact were made publicly available.

56. Following that ruling, on May 5, 2016, Golden Gate and Nassau formally acquired Phoenix and PHL with the approval of the Connecticut Insurance Commissioner.

57. As a result of the acquisition, PHL became a privately-held, wholly-owned subsidiary of Nassau Holdings, and PHL's former executives and Board of Directors were replaced with Nassau leadership.

58. In August 2016, Nassau caused PHL to send to all existing policyholders, including Plaintiffs, a letter promising that PHL "***will prepare financial statements in accordance with Statements of Statutory Accounting Principles ("STAT")***" and that "***the [Nassau] acquisition of Phoenix does not change your contract's terms or conditions***."

59. Again, this was a misrepresentation. Through Defendants' conduct described below, Defendants knew or should have known that their planned course of conduct would materially harm Plaintiffs and interfere with their policy contracts, all for the benefit of Defendants.

Defendants' subsequent course of conduct in raiding PHL's assets for their own benefit and at the expense of PHL policyholders, including Plaintiffs, and causing PHL to file financial statements that were noncompliant with STAT to conceal PHL's true financial condition, further demonstrates Defendants' knowledge and intent.

60. Thereafter, beginning in August 2016, Defendants caused PHL to send all existing policyholders, including Plaintiffs, letters regarding the payment of ongoing premium ("Premium Notices"). These Premium Notices represented to Plaintiffs that the terms of their policies would be honored so long as they continued to pay premium—another misrepresentation.

61. Between August 2016 and May 2024, Defendants caused PHL to send Premium Notices regularly to policyholders, including Plaintiffs.

62. Plaintiffs, in reliance on Defendants' representations about maintaining PHL operations and honoring PHL policies, continued paying premiums on each of their policies.

63. Nonetheless, during this time period, Nassau and Golden Gate implemented their deceptive scheme through multiple tactics carried out by and through an enterprise comprised of additional related entities. Contrary to their representations to Plaintiffs and to the Connecticut Insurance Commissioner, Nassau and Golden Gate set in motion their plan to drain PHL's assets at the expense of PHL's policyholders. Because of Nassau and Golden Gate's pillaging of PHL, PHL was soon unable to pay claims—the direct and foreseeable consequence of Defendants' scheme to drain PHL of its assets for their own benefit.

## D. NASSAU AND GOLDEN GATE BECOME STOLI INVESTORS AND CALL IT THE "BUYBACK PROGRAM" AT THE EXPENSE OF PHL AND ITS POLICYHOLDERS.

64. Immediately following PHL's acquisition, Defendants initiated the first phase of their scheme to pillage capital from PHL: The Buyback Program. The purpose of the Buyback Program was for Nassau and Golden Gate to use PHL's liquidity to acquire PHL's STOLI policies

through shell entities for their own benefit. The Buyback Program was the brainchild of Nassau CEO Phil Gass and Nassau executive Justin Mosbo, and discovery will likely show that it was approved by Golden Gate and its founder, David Dominik, as a result of Golden Gate's partnership with Nassau.

65. The Buyback Program involved acquiring many of the same STOLI policies that made PHL financially vulnerable between 2009-2013, discussed *supra*, because the current owners of these policies were institutional investors that calculated the precise minimum premium they needed to pay and never lapsed the policies. Nassau and Golden Gate created shell entities to purchase these policies on the secondary market at a steep discount (because of their illegal nature) to do the exact same thing (pay minimum premiums and never lapse) all the while knowing that, through the COI Litigation settlement, Defendants had ensured that PHL forfeited its ability to challenge the legality and enforceability of its STOLI policies.

66. As noted above, on April 19, 2016, Nassau and Golden Gate represented to the Connecticut Insurance Department that Nassau had committed to making a $100 million capital contribution which was to be used "solely to support the insurance operations of Phoenix and PHL." That was not true. Defendants actually used that $100 million to fund the acquisition of PHL's STOLI policies for their own benefit under the guise of affiliated transactions among intercompany shell entities.

***i. Defendants Force PHL to Issue Sham Loans to Nassau Affiliates and Misrepresent the Character of its Intercompany Transaction to the Connecticut Insurance Department.***

67. Nassau and Golden Gate falsely portrayed the Buyback Program to the Connecticut Insurance Department as PHL issuing valid, arm's-length loans to affiliated companies who would use the loan proceeds to acquire previously-issued PHL UL Policies for the purpose of de-risking PHL's exposure on such policies.

68. In 2017, Nassau executives Phil Gass and Kostas Cheliotis (serving on PHL's Board while at the same time serving as Nassau's CEO and GC) caused PHL to loan over $100 million dollars to a newly-formed, wholly-owned Nassau shell entity eventually known as DSM Sands LLC (formerly known as JOG Works LLC (collectively, "DSM Sands")), which in turn made a reciprocal loan to another newly-formed and wholly-owned Nassau shell entity known as Westgate Delaware LLC (formerly known as Lifebook Investments Designated Accounts Company (Ireland) (collectively, "Westgate")).

69. These intercompany affiliate loans were not real loans: They were not arm's-length transactions; the borrowers lacked adequate capital to repay the loans; the loans did not mature until 2037; and no principal was even due for the first five (5) years (the "Sham Loans"). The total value of Sham Loans eventually increased from $100 million to approximately $150 million.

70. Defendants knew the Sham Loans lacked economic substance because DSM Sands and Westgate had no employees, no personnel, no separate email domain, no website, and were under the complete control of Nassau and Golden Gate at the time the Sham Loans were issued. Indeed, the putative board members of DSM Sands and Westgate were Nassau's own executives—Phil Gass and Kostas Cheliotis. Neither DSM Sands nor Westgate maintained their own financials, offices, or owned any assets other than the assets associated with the Buyback Program. Neither DSM Sands nor Westgate were capable of repaying the Sham Loans, as Defendants knew, because Defendants never intended PHL to be repaid. Nassau's relevant corporate structure is below, which is also attached in full as Exhibit 1.




71. In August 2017, Nassau's Vice President and General Counsel, Sam Caligiuri (also serving as PHL's Vice President and Assistant Secretary), petitioned the Connecticut Insurance Department to approve PHL's Sham Loans, which were described as a "revolving loan facility" in connection with the so-called Buyback Program.

72. In that August petition, Nassau represented that DSM Sands, in turn, would make a reciprocal loan to Westgate and that Westgate would use the loan proceeds to purchase and own certain UL Policies that had been previously issued by PHL and owned by an unaffiliated third party called Tiger Capital LLC.

73. To convince the Connecticut Insurance Department to approve the Sham Loans for the Buyback Program, Nassau misrepresented that the UL Policies that Westgate planned to purchase would "de-risk [PHL's] UL block of business."

74. That was not true. Nassau concealed that these policies to be purchased were illegal STOLI policies and that it intended to step into the shoes of a STOLI investor, hoping to profit off PHL's most unprofitable block of business. Instead of purchasing the STOLI Policies and lapsing them—which would have erased $1 billion of liabilities from PHL's books and "de-risk[ed] the

UL block of business" as Nassau originally represented—Nassau executives (acting through Westgate as its sole board members) caused Westgate to pay only the minimum premium on these policies until they could collect the full amount of the death benefit from PHL when the insureds died.

75. Nassau also misrepresented to the Connecticut Insurance Department that the transaction was "arm's-length." That was not true. Nassau concealed that DSM Sands and Westgate were undercapitalized shell entities with no assets, financials, offices, employees, independent email domains, or websites, and that they operated under the complete control of Golden Gate and Nassau.

76. Nassau did not operate Westgate to be profitable in its own right. Westgate's only assets were the Buyback Program policies that it held for the benefit of Nassau. Thus, Nassau knew that the Sham Loans—in the approximate amount of $150 million—would never be repaid and that this was not an arm's-length transaction.

77. Finally, Nassau misrepresented to the Connecticut Insurance Department that this intercompany transaction was both "fair and reasonable" under Connecticut Statute Section 38a-136(1). There was nothing "fair" or "reasonable" about this transaction, which permitted Nassau's affiliate, Westgate, to become a STOLI investor for the benefit of Nassau and Golden Gate and at the expense of PHL and its policyholders, including Plaintiffs.

#### *ii. Defendants Misrepresent The Character of a Second Intercompany Transaction to Sustain the Buyback Program.*

78. In December 2017, Nassau's Vice President and General Counsel, Sam Caligiuri (also serving as PHL's Vice President and Assistant Secretary), petitioned the Connecticut Insurance Department a second time to approve another intercompany transaction called a

"Subscription Agreement" with its affiliate and offshore captive reinsurer, Nassau Re (Cayman) Ltd. ("Nassau Re Cayman").

79. Nassau sought Department approval for the entry of a "Subscription Agreement," which permitted Nassau Re Cayman to satisfy Westgate's minimal obligations under the Sham Loans to sustain the Buyback Program for two years.

80. But again in this application, Nassau concealed that Westgate had no assets, that Nassau was not operating Westgate to be independently profitable, and that, therefore, Westgate was not going to have the "financial wherewithal" to independently satisfy its obligations to PHL under the Sham Loans now or in two years. And the very terms of the Subscription Agreement permitted Westgate and Nassau Re Cayman to terminate the Subscription Agreement at will, and without the approval of the Connecticut Insurance Department.

81. In Nassau's December application, Nassau again misrepresented that this transaction was "fair and reasonable" and at "arm's length." Neither representation were true. The net result of this "Subscription Agreement" was that Nassau was permitted to operate Westgate as a complete shell and undercapitalize Westgate, while at the same time meet Westgate's minimal obligations to PHL under the Sham Loans through Golden Gate's wholly owned subsidiary, Nassau Re Cayman, in order to sustain the Buyback Program for as long as Nassau and Golden Gate deemed necessary. Nothing about this transaction was "fair" or "reasonable" to PHL policyholders like Plaintiffs. In fact, Nassau's petition to the Connecticut Insurance Department that the Subscription Agreement only last two years—and was terminable at will—demonstrates that Defendants never intended that the Sham Loans be repaid.

82. As discovery will likely show, during the term of the Subscription Agreement, Nassau Re Cayman caused the transmission of funds from the Cayman Islands to or through the

United States to satisfy at least some portion of Westgate's loan obligations and to promote and facilitate the continuation of the Defendants' scheme to defraud Plaintiffs.

#### *iii. Nassau Directs Westgate to Purchase $1 Billion of Illegal STOLI Policies and Pay the Minimum Premium to PHL.*

83. At the direction and under the control of Nassau, Westgate used the proceeds from the Sham Loans to purchase previously issued PHL STOLI policies for the benefit of Nassau under the so-called Buyback Program. Nassau selected the policies to purchase, and Westgate had no say in the acquisition of these policies. Westgate also did not separately conduct any analysis on the policies' validity, because Westgate was simply a shell company holding the policies for the benefit, and at the direction, of Nassau executives. Westgate's only board members were Phil Gass and Kostas Cheliotis, both of whom served on Nassau's board and were Nassau executives.

84. By April 2020, Westgate had acquired 136 STOLI policies through the Buyback Program, with a total face value of approximately $1 billion.

85. Westgate paid the minimum premium on each STOLI policy and, as discovery will likely show, none of these policies ever lapsed. In other words, Nassau used Westgate to profit from PHL's STOLI policies as STOLI investors at the expense of PHL and its policyholders, including Plaintiffs. And on the other hand, Nassau grossly misrepresented the nature of these transactions—which were intercompany transactions with no semblance of arm's length dealings—to the Connecticut Insurance Department in order to convince the Department to approve these transactions.

86. As for the balance of PHL's $150 million loan to Westgate, as of December 2025—three years after principal payments allegedly became due—the principal balance of the Sham Loans remained roughly the same: $150 million. Discovery is expected to demonstrate that Nassau

never intended that Westgate or DSM Sands make substantial principal payments to PHL or repay the Sham Loans. In fact, ***the Sham Loans were never repaid***.

87. Accordingly, the result of the Buyback Program was that approximately $150 million of PHL assets was funneled out of PHL and used to fund Defendants' purchase of 136 PHL STOLI policies that Defendants placed into Westgate for their own benefit.

### E. DEFENDANTS SIPHONED PHL ASSETS INTO THEIR OWN DUBIOUS FINANCIAL VEHICLES TO PROFIT FROM COMMISSIONS AND USURIOUS FEES AND THEN CONCEALED THE NATURE OF THESE TRANSACTIONS.

88. Since its inception, PHL was interested in secure investments that ensured its long-term health. And when Defendants acquired PHL, Nassau's CEO Phil Gass and Golden Gate's General Counsel, Stephen D. Oetgen, testified to the Connecticut Insurance Department that Nassau and Golden Gate had no plans to implement material changes to those practices.

89. That was not true. Defendants were interested in short-term gains, not long term sustainability. From the beginning, Defendants planned to pillage PHL's consistent stream of revenue (i.e., Plaintiffs' premium payments) by investing in Defendants' high-risk and illiquid assets that were owned, controlled, and/or managed by Defendants' subsidiaries. Defendants did not care whether these so-called investments went up, down, or sideways because Defendants profited either way through usurious fees and commissions. And in 2017 and 2020, Defendants caused PHL to send letters to policyholders, including Plaintiffs, increasing the cost of insurance due to so-called unanticipated factors including "investment earnings." As a result, Defendants induced Plaintiffs to increase their premium payments so that additional capital could be deployed into Defendants' self-serving financial vehicles.

90. Finally, Defendants needed to avoid scrutiny of these very questionable transactions, and did so by failing to make required public disclosures. Under Statements of

Statutory Accounting Principles ("STAT"), Defendants were required to disclose these self-serving investments as "affiliated" transactions. Defendants failed to do so. In this way, Defendants concealed the nature of these transactions from Plaintiffs, the public, and the Connecticut Insurance Department in order to avoid scrutiny.

***i. Defendants Pillage PHL's Assets into Their Own Dubious Investment Vehicles and Collect Usurious Fees and Commissions.***

91. The first step of Defendants' pillaging scheme was to establish the structure necessary to implement it. That process commenced before Defendants' acquired control of PHL in 2016.

92. In November 2015, Golden Gate and Nassau formed Nassau Asset Management LLC ("NAMCO") as a wholly owned subsidiary of what was originally Nassau Holdings, but is now known as Nassau Financial.[3] Like Golden Gate and Nassau, David Dominik was (and still is) the ultimate controlling person of NAMCO. In May 2017, Golden Gate and Nassau also formed Nassau Corporate Credit LLC ("Nassau Corporate Credit") as a wholly owned subsidiary of NAMCO, and NCC CLO Manager LLC ("Nassau CLO Manager"), as a wholly owned subsidiary of Nassau Corporate Credit. *See* Exhibit 1.

[3] Nassau Holdings was the original parent entity and flagship entity of "Nassau." Nassau Financial was not created until in or around 2018 but, after it was created, became the parent company of Nassau Holdings. For this reason, and many others—including the fact that the same individuals, Gass and Cheliotis, ran both companies and sat on the board of both companies—Nassau Holdings and Nassau Financial is collectively referred to "Nassau" throughout this Complaint. Nassau also conflates Nassau Financial and Nassau Holdings on its public website. https://nfg.com/nassau-financial-group (describing Nassau as being founded in 2015, but only Nassau Holdings, and not Nassau Financial, was founded in 2015).




93. The Nassau Corporate Credit investment team was comprised of nine Nassau individuals led by Alexander Jackson, who were selected by Defendants. Nassau Corporate Credit and Nassau CLO Manager were compensated by way of management fees and incentive fees. As with the other Nassau entities, the ultimate controlling person for Nassau Corporate Credit and Nassau CLO Manager was (and still is) David Dominik.

94. Through NAMCO and its subsidiaries, Defendants routed hundreds of millions of dollars of Plaintiffs' premium payments into Nassau's own products, including (i) Nassau's collateralized loan obligation syndicates ("CLOs"), which are pools of leveraged corporate loans made to below-investment-grade companies, (ii) Nassau's collateralized fund obligation (CFO) called Nassau 2019 CFO, LLC ("Nassau CFO"), (iii) a Nassau-controlled private-equity fund called Nassau Private Credit Onshore Fund LP ("Nassau Private Credit"), and (iv) bonds issued by Nassau. *See also infra* ¶¶ 240-44.

95. The Nassau investments described above significantly decreased in value each year to the detriment of PHL and Plaintiffs. Despite that poor performance, Defendants continued to plow PHL's assets into these products because the scheme generated millions of dollars in profits

for Defendants through investment and management fees, commissions, and spreads and other charges associated with these transactions (see below, in millions of dollars).

| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|
| **Nassau CLOs (Total Invested)** | 36.5 | 87 | 112.2 | 131.6 | 170.1 | 171 | 222.3 | 189.1 |
| **Nassau CLOs (Fair Market Value)** | 34 | 76.5 | 89.1 | 73.4 | 108.7 | 79.8 | 123.6 | 102.6 |
| **Nassau CLOs (Loss in value)** | -6.8% | -12.1% | -20.6% | -44.2% | -36.1% | -53.3% | -44.4% | -45.7% |
| **Fees paid to NAMCO** | **5.8** | **9.3** | **14.3** | **13.6** | **12.8** | **10.6** | **8.6** | **7.4** |

96. For example, between 2017 and 2024, NAMCO collected $82.4 million solely in management fees ($10.3 million average per year) from PHL. Discovery will likely show that Nassau Corporate Credit, NCC CLO Manager, and Nassau Alternative Investments LLC ("Nassau Alternative Investments")[4] each received additional fees, commissions, and spreads for managing this portfolio, which resulted in additional and direct payments by PHL to Golden Gate and Nassau executives.

97. In addition to the usurious fees described above, Golden Gate and Nassau executives collected even more fees from PHL every year under a related service agreement with the former parent company, Nassau Companies of New York (formerly Phoenix) ("NCNY"), and its wholly owned subsidiary Nassau Life Insurance (formerly Phoenix Life Insurance Company) ("Nassau Life"). *See* Exhibit 1. Between 2016 and 2024, these "service" fees totaled approximately $375.2 million ($41.7 million average per year) for the direct benefit of Golden Gate, Nassau, and their executives.

98. All of these fees and commissions were significantly above market, as determined by Connecticut Insurance Department officials in or about 2026, and were a vehicle for Nassau,

[4] The manager of Nassau CFO.

Golden Gate, their related subsidiaries, and their executives to misappropriate additional PHL funds without labeling it as a "dividend" on PHL's financial statements.

#### *ii. Defendants Induced Plaintiffs to Pay More Premiums—Twice—By Falsely Representing That PHL's Investment Losses Were Unanticipated.*

99. While taking the above described fees and commissions, Nassau caused PHL to raise its COI rates twice—once in 2017 and again in 2020.

100. On or about August 21, 2017, Nassau caused PHL to send letters to policyholders over U.S. mail, including Plaintiffs, stating in part that PHL was adjusting COI rates because "certain anticipated experience factors are now less favorable than we anticipated when we established the cost of insurance rate schedule." Yet, Defendants continued to drain PHL assets after this 2017 COI adjustment, as discussed above.

101. On or about November 2, 2020, Nassau caused PHL to send a second letter to policyholders over U.S. mail, including Plaintiffs, raising the cost of insurance once again. The rationale this time was that "anticipated experience factors" including "investment earnings…are now less favorable than we anticipated when we established the cost of insurance rate schedule. As such, there will be an increase to cost of insurance rates on your policy. This is an adverse change. This cost of insurance rate change will reduce your policy's accumulation value and may increase the risk that your policy will lapse based on continued payment of current premiums."

102. Even after the 2020 COI premium increases for policyholders, Defendants continued to funnel PHL's available funds from Plaintiffs' premium payments into Nassau's junk products to pay themselves above-market fees and commissions, despite PHL experiencing significant losses each year, as described above.

103. By these COI rate increase letters, Nassau directly harmed Plaintiffs because Plaintiffs were forced to pay more for their existing coverage solely as a result of Defendants' actions in draining PHL of its assets and using PHL's assets to benefit Defendants.

104. Moreover, through their letters, Nassau caused PHL to mislead policyholders, including Plaintiffs, about the basis for the COI premium increases by claiming unanticipated investment losses which thereby induced increased premium payments into PHL for Defendants to continue pillaging for their own benefit. Discovery will show that these statements were false and/or intentionally misleading because Defendants, acting through their executives, forced PHL to purchase risky Nassau investment vehicles for much more than they were worth not because Defendants believed such investments would be profitable for PHL and benefit its policyholders (*i.e.*, Plaintiffs), but simply to inflate Defendants' bottom line and for Defendants' executives to collect usurious fees, commissions, and spreads at the expense of PHL and to the detriment of Plaintiffs.

***iii. Defendants Failed to Disclose PHL's Investments As Affiliated Transactions to Avoid Scrutiny.***

105. The final step was to ensure that Defendants avoided scrutiny of these transactions from Plaintiffs, the public, and the Connecticut Insurance Department.

106. The National Association of Insurance Commissioners ("NAIC") is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories. The NAIC Accounting Practices and Procedures Manual (the "AP&P Manual") provides the rules of statutory accounting for insurers,[5] and the NAIC Financial Condition Examiners Handbook (the

[5] https://content.naic.org/sites/default/files/publication-app-manual.pdf

"Handbook") directs how regulators examine the insurer.[6] Both are authoritative in the determining whether a practice complies with STAT.

107. The AP&P Manual states that the "primary responsibility of each state insurance department is to regulate insurance companies in accordance with state laws with an emphasis on solvency for the protection of policyholders. The ultimate objective of solvency regulation is to ensure that policyholder, contract holder and other legal obligations are met when they come due and that companies maintain capital and surplus at all times and in such forms as required by statute to provide an adequate margin of safety." AP&P Manual, Vol. I, at P-7, ¶ 30.

108. The AP&P Manual further explains that "[r]elated party transactions are subject to abuse because reporting entities may be induced to enter transactions that may not reflect economic realities or may not be fair and reasonable to the reporting entity or its policyholders. As such, related party transactions require specialized accounting rules and increased regulatory scrutiny." *Id.* at 25-1, ¶ 1.

109. Affiliate transactions must be properly reported and disclosed because the relationship "offers the potential for self-dealing, transactions at less than arm's length, favorable treatment, or the ability to direct the outcome of events differently from what might result in the absence of that relationship." Handbook, at 120. Affiliated transactions that must be disclosed include a company's affiliates, principal owners, management and "any other person with which the reporting entity may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests." *Id.*

[6] https://content.naic.org/sites/default/files/publication-fc-examiner-hb.pdf

110. The Handbook recognizes three categories of potential abuses for improperly disclosed related party transactions, including:

1. Misuse of insurance company assets through:
   - (i) Shifting assets (particularly securities) from one affiliate to another for window-dressing purposes during examinations or at the financial statement date;
   - (ii) Making unsecured loans or advances to affiliates;
   - (iii) Maintaining compensating bank balances for the benefit of an affiliate;
   - (iv) Making inappropriate loans to affiliates or purchases of affiliate securities; or,
   - (v) Pledging assets to secure loans for affiliates.

2. Siphoning of insurance company funds through:
   - (i) Dividends;
   - (ii) Management or service fees;
   - (iii) Payment of exorbitant reinsurance premiums to affiliates;
   - (iv) Inappropriate payment of the expense of affiliates; or;
   - (v) Misdirection of premiums or commissions to affiliate insurance companies or agencies.

3. Other forms of misrepresentation:
   - (i) Creating nonexistent receivables due from affiliates for window-dressing purposes during examination, or at the financial statement date;
   - (ii) Assuming the liabilities by/for an affiliate

Handbook, at 119.

111. Between 2018 and 2020, PHL only disclosed its investments in affiliated bonds, in the amounts of $2,986,494 in 2018, $3,019,704 in 2019, and $5,010,211 in 2020.

112. Defendants disclosed ***none*** of the other related-party investments described above between 2018-2023. On PHL's annual statements between those years, none of these investments were reported under PHL's "Investments in Parent, Subsidiaries, and Affiliates." For example, PHL's reporting of affiliate investments is shown below between 2019-2023.

ANNUAL STATEMENT FOR THE YEAR 2023 OF THE PHL Variable Insurance Company

## FIVE-YEAR HISTORICAL DATA

**Show amounts in whole dollars only, no cents; show percentages to one decimal place, i.e. 17.6.**
**$000 omitted for amounts of life insurance**

| | 1<br>2023 | 2<br>2022 | 3<br>2021 | 4<br>2020 | 5<br>2019 |
|---|---|---|---|---|---|
| **Investments in Parent, Subsidiaries and Affiliates** | | | | | |
| 44. Affiliated bonds (Schedule D Summary, Line 12, Col. 1) | | | | 5,010,211 | 3,019,704 |
| 45. Affiliated preferred stocks (Schedule D Summary, Line 18, Col. 1) | | | 0 | 0 | 0 |
| 46. Affiliated common stocks (Schedule D Summary Line 24, Col. 1), | | | 0 | 0 | 0 |
| 47. Affiliated short-term investments (subtotal included in Schedule DA Verification, Col. 5, Line 10) | | 0 | 0 | 0 | 0 |
| 48. Affiliated mortgage loans on real estate | | | | | |
| 49. All other affiliated | | | | | |
| 50. Total of above Lines 44 to 49 | 0 | 0 | 0 | 5,010,211 | 3,019,704 |

113. Defendants pumped PHL's assets into their own dubious financial products without regard to performance, and solely to collect all fees, commissions, and spreads associated with these products while, at the same time, concealing the nature of these self-serving intercompany transactions on PHL's financial statements.

114. The nondisclosure of these affiliated investments avoided the additional and necessary scrutiny of these transactions by the Connecticut Insurance Department and blatantly violated both STAT and generally accepted accounting principles ("GAAP").

### F. DEFENDANTS CEDED PHL'S LIABILITIES TO CAPTIVE SHAM REINSURERS TO CONCEAL PHL'S FINANCIAL CONDITION, FUNNEL HUNDREDS OF MILLIONS OF DOLLARS OF PHL ASSETS TO THE CAYMAN ISLANDS, AND AVOID REGULATORY OVERSIGHT.

115. In order for Defendants to extract Plaintiffs' premiums for nearly a decade before PHL collapsed and avoid regulatory oversight for as long as possible, Defendants needed to conceal the true nature of PHL's financial instability.

116. Defendants improperly used sham, offshore, captive, reinsurance companies that they owned and controlled to conceal PHL's financial instability and to funnel more than $2 billion of PHL's assets to themselves through entities under their ownership and control.

### *i. Defendants Use of Sham Reinsurance To Conceal PHL's Financial Condition and Artificially Inflate PHL's Books to Avoid Regulatory Oversight.*

117. Insurers are heavily regulated. Connecticut and other states compel mandatory capital and reserving requirements as part of the critical financial regulation of insurers designed to protect their financial health and stability for policyholders. These requirements consider, *inter alia*, the insurance company's projected assets (such as premium payments) and the company's projected liabilities—most significantly, the benefits the insurance company will pay on claims against its policies. Put simply, the insurance company will be placed into rehabilitation or liquidation if its liabilities exceed its assets. Insurers are also required to maintain a certain level of liquidity based on the risk-level of its investments known as the Risk-Based Capital (RBC) requirement. *See, e.g.,* Regulations of Connecticut State Agencies (RCSA), § 38a-72.

118. An insurer can decrease its liability by entering into legitimate arm's-length reinsurance agreements with authorized reinsurers. In an arm's length reinsurance agreement, the reinsurer agrees to take on a percentage of the insurer's liability and, in exchange, receives a percentage of the premium payments when they come in. In a legitimate reinsurance transaction, the reinsurer is responsible for its portion of the liabilities (*i.e.,* claims) as they become due. For that reason, the insurer is permitted to reduce its liabilities on its financial statement accordingly in what is known as a "Reserve Credit," but only if the reinsurer is properly capitalized and is able to meet its obligations as they become due.

119. Historically, legitimate reinsurers are chosen not only for their strong financial support, but also for their investment acumen, significant expertise and advice. A knowledgeable, well-capitalized and honest reinsurer can be a tremendous aid in helping a company spread its risks (helping minimize the "too many eggs in one basket" exposure) and share knowledge of good underwriting practices and economic expectations. An independent reinsurer has its own set of

experienced executives, actuaries and other experts who can help the ceding company achieve their shared goals. With well-capitalized and independent reinsurers, the valid purpose for reinsuring risks is achieved.

120. But when the insurer cedes its liabilities to an insufficiently capitalized affiliate that is unable to make good on its obligations as they become due, there is no legitimate transfer of economic risk. Instead, such transactions are like moving claim files from the insurer's claims department to the basement. The insurer still has all of the same risk; there is no genuine risk transfer. Although there can be meaningful purposes for *some* affiliated reinsurance (such as moving certain lines of business to an affiliate that specializes in that line), ceding substantial blocks of business from an insurer to a captive reinsurer as here accomplishes nothing of economic substance, and can be evidence of improper motive.

121. One such improper motive is to create the *appearance* of genuine risk transfer without any meaningful transfer of risk. The insurer reduces its liabilities in the form a "Reserve Credit," which frees up surplus for the insurer to sell more products, pay more dividends, pay more management and investment fees to its subsidiaries, and stay above the minimum surplus and RBC requirements that trigger regulatory oversight.

122. That is exactly what happened here. Golden Gate and Nassau formed two domestic, captive, reinsurers: Concord Re and Palisado Re in 2019 and 2021, respectively. Both Concord Re and Palisado Re were formed in Connecticut, as wholly owned and operated captive reinsurers of PHL. The ultimate controlling person of Concord Re and Palisado Re was David Dominik. Concord Re and Palisado Re were operated out of Nassau's Connecticut Headquarters. Discovery will show that Concord Re and Palisado Re were completely dominated and controlled by Defendants, and intentionally undercapitalized.

123. Nevertheless, beginning in 2019, Defendants caused PHL to cede massive portions of its liabilities to Concord Re, its own captive and undercapitalized reinsurer. Between 2019-2023, PHL reported over $1.3 billion in "Reserve Credit" *each year*, which reduced PHL's liabilities—on paper—by that corresponding amount. That was misleading and improperly inflated PHL's financials to avoid regulatory oversight because Concord Re lacked the independent ability to satisfy these obligations. Simply put, these were nothing but circular, non-economic reinsurance transactions among Defendants' controlled entities.

124. Defendants (acting through Concord Re) then retroceded these liabilities to an entity in the Cayman Islands called Nassau Re Cayman, which was wholly owned and completely controlled by Golden Gate. *See* Exhibit 1.




125. Reinsurers in the Cayman Islands are not subject to traditional U.S. oversight and are subject to less transparency, regulatory scrutiny, and capital requirements than U.S. reinsurers. The Cayman Islands does not require that a reinsurer file any STAT disclosure, and there is no information related to Cayman reinsurers available to the public or the Connecticut Department of Insurance. In other words, PHL's liabilities ultimately ended up on the books of a Cayman Islands' captive reinsurer which was a black box.

126. Concord Re's retrocession of PHL's liabilities to Nassau Re Cayman was a second layer of sham reinsurance because Nassau Re Cayman was not financially viable and/or was

unable—or unwilling—to meet its obligations to Concord Re (which meant Concord Re would then be unable to meet its obligations to PHL). And through this reinsurance sham, Defendants were able to conceal PHL's financial weakness.

127. Specifically, in 2019, Concord Re entered into a 30-year excess-of-loss agreement ("XOL Agreement") with Nassau Re Cayman, pursuant to which Nassau Re Cayman only agreed to provide reinsurance coverage to Concord Re under the terms and conditions specified in the agreement.

128. Under STAT, Concord Re's XOL assets were worthless, but Defendants (acting through Concord Re) grossly overvalued them to improperly inflate Concord Re's balance sheet. In turn, Nassau Re Cayman was unwilling (or unable) to satisfy its reinsurance obligations as they became due. As a result, a black hole mounted on Concord Re's balance sheet.

129. In 2021, the NAIC required that insurers, including PHL, provide additional disclosures related to their wholly owned captive reinsurers including Concord Re and Palisado Re.

130. In PHL's 2021 financial statement, which was filed with the Connecticut Insurance Department, Defendants acknowledged that Concord Re had a negative equity of over $204 million (shown below).

O. SCA Loss Tracking

| SCA Entity | Reporting Entity's Share of SCA Net Income (Losses) | Accumulated Share of SCA Net Income (Losses) | Reporting Entity's Share of SCA's Equity Including Negative Equity | Guaranteed Obligation/Commitment for Financial Support (Yes/No) | Amount of the Recognized Guarantee under SSAP No. 5R |
|---|---|---|---|---|---|
| Concord Re | $ (41,313,412) | $ (251,849,533) | $ (204,110,593) | No | $ - |

131. Yet, in the same financial statement, PHL claimed that Concord Re and Palisado Re had a book/adjusted carrying value of **$0** (shown below).

ANNUAL STATEMENT FOR THE YEAR 2021 OF THE PHL Variable Insura

**SCHEDULE D - PART 2 - SECTION 2**

Showing All COMMON STOCKS Owned December 31 of Current Year

| 1 | 2 | Codes | | 5 | 6 | Fair Value | | 9 | Dividends | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 3 | 4 | | | 7 | 8 | | 10 | 11 |
| CUSIP Identi-fication | Description | Code | For-eign | Number of Shares | Book/ Adjusted Carrying Value | Rate Per Share Used to Obtain Fair Value | Fair Value | Actual Cost | Declared but Unpaid | Amount Received During Year |
| 382170-11-5 | GOODRGO COMMON WARRANT | | | 416.670 | 333.335 | 799.997 | 333.335 | 383.335 | 0 | 0 |
| 9099999. Subtotal - Common Stock - Industrial and Miscellaneous (Unaffiliated) Publicly Traded | | | | | 333.335 | XXX | 333.335 | 383.335 | 0 | 0 |
| AB8994-90-1 | FEDERAL HOME LOAN BANK CAPITAL STOCK | RF | | 3.589.000 | 358.900 | 100.000 | 358.900 | 358.900 | 0 | 6.012 |
| PRV002-39-4 | Alpha Media Holdings Inc | | | 872.000 | 60.168 | 69.000 | 60.168 | 60.168 | 0 | 0 |
| PRV002-40-2 | Alpha Media Holdings Inc | | | 20.795.000 | 1.434.855 | 69.000 | 1.434.855 | 1.434.855 | 0 | 0 |
| 9199999. Subtotal - Common Stock - Industrial and Miscellaneous (Unaffiliated) Other | | | | | 1.853.923 | XXX | 1.853.923 | 1.853.923 | 0 | 6.012 |
| 696448-10-5 | Palisado Re. Inc | | | 100.000.000 | 0 | 0.000 | 0 | 30.250.000 | | |
| 20647#-10-3 | Concord Re. Inc | | | 100.000.000 | 0 | 0.000 | 0 | 0 | | |
| 9399999. Subtotal - Common Stock - Parent, Subsidiaries and Affiliates Other | | | | | 0 | XXX | 0 | 30.250.000 | 0 | 0 |

132. Taken together, Golden Gate and Nassau executives disclosed the black hole that was mounting but then failed to attribute those significant massive liabilities to PHL itself—even though Schedule D required it to disclose the adjusted value of its wholly owned subsidiaries.

133. The reason is simple: If Concord Re's value would have been properly disclosed in Schedule D, PHL would have been subject to additional regulatory oversight and scrutiny.

134. PHL's true financial condition only further deteriorated in 2022, as Defendants continued to funnel Plaintiffs' premiums to their own unauthorized reinsurer in the Cayman Islands for the benefit of their executives. In 2022, PHL reported Concord's negative equity had grown to more than **negative $391 million**.

135. But in this 2022 PHL financial statement, Golden Gate and Nassau executives—acting through PHL—failed to disclose Concord on Schedule D **at all**, in order to further conceal the hazardous condition of PHL.

136. In 2023, PHL's negative equity in Concord Re grew to **$608 million**, and PHL's negative equity in Palisado Re was **$38 million**. Unsurprisingly, as PHL buckled under the weight of Defendants' looting, Golden Gate and Nassau again forced PHL to omit Concord Re and Palisado Re entirely from its Schedule D in 2023.

137. The result of Defendants' conduct was simple: Defendants were able to conceal PHL's true financial condition through a series of sham reinsurance transactions to avoid increased regulatory scrutiny, which blatantly violated STAT and GAAP.

### *ii. Defendants Used Sham Reinsurance to Funnel Billions of Dollars to Their Own Captive Reinsurers for the Benefit of Defendants and Their Executives.*

138. Defendants' sham reinsurance scheme came with another huge upside: Defendants were able to siphon billions of dollars of PHL assets to their own wholly-owned captive reinsurers.

139. In a legitimate arm's-length reinsurance transaction, the insurer transfers a certain amount of premiums it receives to the reinsurer in consideration for the reinsurer taking on a portion of the reinsurer's liability.

140. Here, Defendants funneled over $1.5 billion of Plaintiffs' premiums from PHL to Concord Re in connection with the sham reinsurance transactions described above in 2019 alone.

141. Between 2020 and 2023, Defendants funneled approximately $200 million in Plaintiffs' premium payments to Concord Re *each year*. Discovery will likely show that Concord Re passed those proceeds on to Nassau Re Cayman in connection with their own reinsurance arrangement where Concord Re retroceded PHL's liabilities, including the XOL Agreement.

142. The result was that a sizable portion of Plaintiffs' premium payments, which should have been used to ensure PHL had adequate assets to pay out Plaintiffs' insurance benefits, were ultimately funneled to Defendants and their executives through their sham reinsurance shell game.

### *iii. Defendants Used Modified Co-Insurance Agreements to Improperly Inflate PHL's RBC Calculation.*

143. Beginning in 2016, Golden Gate and Nassau executives (in their capacity as PHL Board Members) entered into several modified co-insurance agreements ("ModCo") with their affiliates. ModCo permits an insurer to retain both the assets and liabilities on its books, even

though the ultimate entity responsible for the underlying liability is the reinsurer. The assets that remain on the insurer's books that are subject to ModCo count towards the insurer's admitted assets *but do not* count towards the insurer's risk-based capital (RBC) calculation. In this way, discovery will likely demonstrate that Defendants used ModCo to conceal the riskiest intercompany investments (described *supra*, Section I.E.) from their RBC calculation in order to avoid maintaining additional liquidity for PHL.

144. Since 2016, Golden Gate and Nassau executives (serving on PHL's Board) consistently used captive reinsurance and ModCo agreements. The below reflects the billions of dollars of reinsurance and ModCo to Defendants' affiliates from 2014 to 2023:




145. These transactions were not arm's-length; Golden Gate and Nassau executives were on both sides of the transactions, and Defendants intentionally undercapitalized their captive reinsurers so that they lacked sufficient assets to pay PHL's liabilities as they became due.

146. Defendants' deception allowed the scheme to proceed: Plaintiffs regularly sent their premiums to PHL (including the increased premiums they were required to pay due to Defendants' above-mentioned COI increase demands); and Defendants then sent that cash to their wholly controlled subsidiary in the Cayman Islands—a company with no domestic oversight—for the benefit of Golden Gate and Nassau executives. At the same time, this reinsurance scheme

concealed PHL's true financial condition through sleight-of-hand accounting that was noncompliant with GAAP and STAT, in order to avoid regulatory oversight and buy Defendants' executives more time to misappropriate PHL's assets, including Plaintiffs' premium payments.

147. Defendants also knew that their conduct violated Connecticut insurance regulations, which require transactions within a holding company system (such as the system created by Golden Gate, Nassau, PHL): (i) to be fair and reasonable; (ii) the books and records of each party must be maintained so as to disclose the precise nature of all transactions; and (iii) the insurer's surplus must be reasonable in relation to the company's outstanding liability. Conn. Stat. § 38a-136(a). Defendants' conduct described above, which extracted all of Plaintiffs' premium payments out of PHL for the benefit of Nassau and Golden Gate and at the expense of Plaintiffs, was not "fair" or "reasonable."

### G. DEFENDANTS CAUSE PHL TO PAY THEM EXTRAORDINARY DIVIDENDS DESPITE PHL'S DECLINING FINANCIAL CONDITION.

148. In 2018, Golden Gate and Nassau executives restructured PHL's corporate structure so that PHL was no longer owned by NCNY (formerly Phoenix), but instead owned by a newly-created shell entity called PHL Delaware LLC ("PHL Delaware"). *See* Exhibit 1.



149. Much like Defendants' Buyback Program entities discussed above, PHL Delaware was a shell entity that was wholly owned and controlled by Defendants. PHL Delaware had no employees, no personnel, no payroll, no separate email domain or website, no separate offices, and was controlled by Defendants' executives. The purpose of the restructuring was to isolate PHL and the Buyback Program entities described above, and to undercapitalize these entities for the benefit of Golden Gate and Nassau's executives and its subsidiaries, including NCNY, Nassau Life Insurance Company (formerly Phoenix Life Insurance Company, and collectively, "Nassau Life "), and Nassau Life and Annuity Company ("NLA").

150. Under Connecticut Statute § 38a-136(a)(5), "the insurance company's surplus shall be reasonable in relation to such company's outstanding liabilities and adequate to its financial needs…."

151. In 2019, PHL declared it would cease issuing new policies because its financial condition had deteriorated. Since Golden Gate and Nassau's acquisition of PHL in 2016, PHL's surplus eroded dramatically as shown below:



152. Despite PHL's financial distress, Defendants continued to cause PHL and PHL's sister companies to issue extraordinary and improper dividends for Defendants' ultimate benefit.

153. For example, in 2018, PHL's sister company, Nassau Life, paid an extraordinary dividend to PHL's former parent company, NCNY, in the amount of $60 million.

154. In 2019, Nassau Life paid another extraordinary dividend to NCNY in the amount of $60 million.

155. Also in 2019, PHL paid an extraordinary dividend to its newly formed parent company, PHL Delaware, in the amount of $48 million.

156. These extraordinary dividends were unjustified given PHL's precarious financial condition and, thus, violated Connecticut Statute § 38a-136(a)(5). And discovery will likely demonstrate that the ultimate recipients of these extraordinary dividends were Nassau, Golden Gate, and their executives.

## II. DEFENDANTS' CONDUCT DRIVES PHL INTO REHABILITATION.

157. On May 17, 2024, the Commissioner of the Connecticut Insurance Department (the "Commissioner") petitioned the Connecticut Superior Court to be appointed as rehabilitator of PHL, Concord Re, and Palisado Re, all of which were "operating in a financially hazardous condition" and lacked sufficient assets to pay Plaintiffs' claims as they became due (the "Rehabilitation Proceedings").

158. On or about May 17, 2024, the Commissioner sought a $300,000 cap on the death benefit payment amounts for Plaintiffs' policies, even though the policy terms provided for greater death benefit payment amounts (the "Petition"), and even though Plaintiffs had paid their premiums for many years to obtain higher death-benefit payment amounts.

159. On May 20, 2024, the Connecticut Superior Court granted the Petition and issued the Moratorium Order. The Moratorium Order placed a $300,000 cap on death benefit claims for

all life insurance policies issued by PHL, including Plaintiffs' claims, irrespective of the amount of coverage applied-for and the corresponding premium payments made to keep that coverage in effect since the issuance of the policy.

160. According to the Rehabilitator's First Accounting and Status Report issued on November 20, 2024, the projections for the fourth quarter of 2023 showed the combined present-value basis of the subject entities as **negative $900 million**. By the third quarter of 2024, the combined basis, reflecting the subject entities' approximate capital and surplus deficiencies and *after eliminating intercompany transactions*, skyrocketed to **negative $2.1 billion**.

161. Although PHL was expected to remain in rehabilitation for some time, and despite certain transactions considered by the Rehabilitator for addressing PHL's deficit, the Rehabilitator recently stated that he expects that PHL will enter liquidation, where the Connecticut guaranty association limits ($300,000) will cap the benefits guaranteed to PHL's policyholders.

162. By 2025, Defendants achieved the ends of their fraudulent scheme: Defendants lied to PHL, Plaintiffs, and the Connecticut Insurance Department to convince them that Nassau intended to continue operating PHL as a viable insurance company; implemented the Buyback Program to divert $150 million from PHL to shell entities so Defendants could acquire and collect on illegal STOLI Policies whose legality could not be challenged based on PHL's settlement of the COI Litigations which was driven by Defendants; paid Nassau-affiliated investment managers exorbitant fees for underperforming investments; funneled hundreds of millions of dollars of Plaintiffs' premium payments to unregulated, undercapitalized offshore reinsurance entities and affiliates wholly controlled by Defendants; paid themselves massive and improper dividends; and prolonged the scheme for as long as possible by concealing PHL's true financial condition from regulators and Plaintiffs.

163. In sum, Plaintiffs paid years of premiums to PHL in reliance on Defendants' misrepresentations that they would operate PHL as a viable company. Nassau and Golden Gate furthered those misrepresentations by concealing the true nature of PHL's operations from regulators and Plaintiffs, and by concealing the exorbitant fees and dividends that Nassau, Golden Gate, and its affiliated companies reaped from their scheme. As a result, PHL is primed for liquidation, and Plaintiffs have been damaged as a result of Defendants' conduct.

**A. THE HAGEE POLICIES ARE SUBJECT TO THE MORATORIUM ORDER.**

164. In or around October 2006, PHL issued (i) the Polly Hagee Policy as a Universal Life Insurance Policy insuring the life of Polly M. Hagee for $2,000,000 in coverage, and (ii) the Gerald Hagee Policy as a Universal Life Insurance Policy also insuring the life of Polly M. Hagee for $1,000,000.

165. The Hagee Policies were procured for the benefit of the Hagee family and for estate planning for the Hagee family through the Polly Hagee Insurance Trust and the Gerald D. Hagee Insurance Trust (collectively, the "Hagee Trusts").

166. Following PHL's issuance of the Hagee Policies, the Hagee family funded the initial premium payment to place the policy in force. Thereafter, the Hagee family funded all premiums to keep the Hagee Policies in force and with a positive cash value.

167. The Hagee Trusts owned the Hagee Policies since their inception, and at no time sought or received funding from a third-party to finance the Policies' premiums.

168. In around May 2024, the Hagee Trusts received notice from the Connecticut Insurance Department that the Hagee Policies were subject to PHL's Rehabilitation Proceedings and the Moratorium's $300,000 cap on payable death benefits.

169. As a result of Defendants' conduct, the Hagee Trusts have suffered damages including, but not limited to, the face value of the their policies as applied-for, attorneys' fees, punitive damages, and such other relief that the Court deems just and proper.

**B. THE LAWLEY POLICY IS SUBJECT TO THE MORATORIUM.**

170. In 2011, PHL issued the Lawley Policy, which is a universal life policy insuring the life of Gregory Lawley with a total death benefit of $2,000,000.

171. The Lawley Policy was procured for the benefit of the Lawley family and for estate planning for the Lawley family through the Gregory Todd Lawley Irrevocable Life Insurance Trust (the "Lawley Trust").

172. Following PHL's issuance of the Lawley Policy, the Lawley family funded the initial premium payment to place the policy in force. Thereafter, the Lawley family funded all premiums to keep the Lawley Policy in force and with a positive cash value.

173. The Lawley Trust owned the Lawley Policy since its inception, and at no time sought or received funding from a third-party to finance the policy's premiums.

174. In around May 2024, the Lawley Trust received notice from the Connecticut Insurance Department that the Lawley Policy was subject to PHL's Rehabilitation Proceedings and the Moratorium Order's $300,000 cap on payable death benefits.

175. As a result of Defendants' conduct, the Lawley Trust has suffered damages including, but not limited to, the face value of the Lawley Policy as applied-for, attorneys' fees, punitive damages, and such other relief that the Court deems just and proper.

## CLASS ACTION ALLEGATIONS

176. Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

177. **Nationwide Class:** Plaintiffs seek to represent a class (the "Class") defined as:

> All individuals in the United States who owned a life insurance policy or were a beneficiary of a life insurance policy issued by PHL as of May 17, 2024, individually or through a trust or other entity, (i) with a death benefit in excess of the $300,000 cap imposed by the Moratorium Order in *Mais v. PHL Variable Ins. Co., et al.*, Dkt. No. X06-UWY-CV-24-6085274-S (Conn. Super. Ct. June 25, 2024), (ii) where the policy was in force on August 1, 2016, and (iii) where the policyholder continued to pay premium between August 1, 2016, and May 20, 2024. The class includes all policies where the claim was paid subject to the Moratorium Order and any modifications thereto, and policies that will be subject to the Moratorium Order in the future. The class also includes policies that were lapsed or surrendered after May 20, 2024.
>
> The class excludes (i) policies that are owned by an institutional investor or where the direct or indirect beneficiary of the policy is an institutional investor, and (ii) Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendants, and their successors, assigns, or other persons related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

178. **Numerosity:** The members of the class are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.

179. Specifically, according to a March 10, 2026 Supplemental Report submitted by the Rehabilitator, as of December 31, 2025, PHL serviced approximately 8,000 active universal life-insurance policies, of which approximately 3,200 have death benefits greater than the applicable state guaranty association limit, of which approximately 2,900 policies are owned by individuals rather than institutional investors. The Class therefore consists of these approximately 2,900 policies. Further, discovery will likely show that PHL maintains records of active life-insurance policies in the normal course of business, including with respect to each policy: the identity of the policyholder(s) and the amount of coverage as applied-for. Thus, Class members may be identified and notified of the pendency of this action by first class mail, electronic mail, and/or published notice, as is customarily done in consumer class actions.

180. **Existence and Predominance of Common Questions of Law and Fact:** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. The questions of law and fact common to the Class arising from Defendants' conduct include, without limitation, whether:

a. Defendants tortiously interfered with the life-insurance contracts owned by the Class members, including by draining PHL's assets for Defendants' benefit and rendering PHL unable to pay claims in full as they became due.

Legal issues relating to individual Class members do not predominate because all of Plaintiffs' tortious-interference claims would be analyzed under Connecticut law. But even if this claim was analyzed under the laws of the Plaintiffs' various home states, it would not materially change the analysis because each state prescribes the same basic elements for tortious interference.

Factual issues relating to individual Class members do not predominate because Plaintiffs' claims will be established through the same common facts, *i.e.,* Defendants' interference with Plaintiffs' contract with PHL through the misconduct detailed above.

b. Defendants fraudulently (or at least negligently) misrepresented their intention to operate PHL as it had customarily been operated and failed to disclose to Plaintiffs that Defendants plundered PHL's assets. Defendants also fraudulently misrepresented their intention to maintain PHL's finances in accordance with GAAP and STAT. Defendants also induced Plaintiffs through regular Premium Demand letters to believe that, if they continued to pay ongoing premiums, Plaintiffs would receive the full amount of their death benefits. Plaintiffs relied on these representations to their detriment by continuing to pay premiums.

Legal issues relating to individual Class members do not predominate because Plaintiffs' fraud claims would be analyzed under Connecticut law. But even if this claim was analyzed under the laws of the Plaintiffs' various home states, it would not materially change the analysis because each state prescribes the same basic elements for fraud claims.

Factual issues relating to individual Class members do not predominate because the basis for Plaintiffs' fraud claim is the same for the entire class. Factual issues also do not predominate in the reliance prong because all of the Class members are policyholders that owned PHL policies before these representations were made and then subsequently continued paying premiums after those representations were made in reliance on those misrepresentations.

c. Acted unlawfully as part of a conspiracy to defraud Plaintiffs and tortiously interfere with Plaintiffs' existing contracts with PHL.

Legal issues relating to individual Class members do not predominate because Plaintiffs' conspiracy claim would be analyzed under Connecticut law. But even if this claim was analyzed under the laws of the Plaintiffs' various home states, it would not materially change the analysis because each state prescribes the same basic elements for civil conspiracy.

Factual issues relating to individual Class members do not predominate for the reasons discussed above.

d. Acted unlawfully by aiding and abetting and providing substantial assistance to each other.

Legal issues relating to various individual Class members do not predominate because all of Plaintiffs' conspiracy claim would be analyzed under Connecticut law. But even if this claim was analyzed under the laws of the Plaintiffs' home states, it would not materially change the analysis because each state prescribes the same basic elements for aiding and abetting.

Factual issues relating to individual Class members do not predominate for the reasons discussed above.

e. Defendants violated the Racketeer Influenced and Corrupt Organizations Act, Sections 1962(c) and 1962(d), through a pattern of racketeering through predicate acts of mail and wire fraud and money laundering, namely: (i) fraudulently misrepresenting their intent to operate PHL as it had been operated in the past, and falsely promising Plaintiffs that Nassau's acquisition of PHL would not change or affect any of their policy terms; (ii) purchasing previously-issued PHL STOLI policies for their own benefit, while minimally funding those policies to the detriment of PHL and Plaintiffs; (iii) extracting PHL liquidity for the purpose of funding their own risky investment vehicles—irrespective of output and performance—so that Defendants could collect substantially above-market management fees, commissions, and spreads on those transactions; (iv) paying themselves extraordinary dividends, even when Defendants knew that PHL was financially unstable; and (v) using offshore captive reinsurers to extract additional capital and to conceal PHL's true financial condition and Defendants' scheme to defraud Plaintiffs of the value of their policies.

Legal issues relating to the individual Class members would not predominate because RICO is a federal statute.

Factual issues relating to the individual Class members would not predominate because the underlying predicate acts involve common facts.

181. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class in that Defendants violated Plaintiffs' rights in the same manner as they violated the rights of every Class member.

182. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel that is highly experienced in life insurance transactions (in particular, STOLI transactions and insurance insolvency issues), and complex commercial litigation including lawsuits that involve civil RICO claims, and Plaintiffs intend to vigorously prosecute this action on behalf of the Class. Furthermore, Plaintiffs have no interests that are antagonistic to those of the Class.

183. **Superiority:** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden, complexity, and expense of individual litigation of their claims against Defendants, each of whom are sophisticated. Furthermore, even if Class members could afford such individualized litigation, doing so would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class-action structure provides the benefits of adjudicating these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

184. In the alternative, the Class may be certified because:

a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendants;

b. The prosecution by separate actions by individual Class members would create a risk of adjudications with respect to them that would be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

**c.** Defendants have acted or not acted on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

**COUNT I**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**
**(Against All Defendants)**

185. Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

186. After acquiring PHL, Defendants knew about the contractual relationship between PHL, on the one hand, and Plaintiffs, on the other hand.

187. Defendants intentionally, improperly, and tortiously interfered with PHL's contractual relationship with Plaintiffs for Defendants' own material benefit, as discussed above.

188. As alleged above in detail, Defendants acted with both an improper motive and employed improper means in its intercompany dealings with PHL to extract funds that otherwise should have been available to pay legitimate policyholders' death benefit claims. Defendants and PHL also did not have the same economic interests that normally exist in a parent/subsidiary relationship, because Nassau and its executives were not interested in restoring the once-profitable insurer PHL, but instead, drained assets from PHL for their own benefit.

189. Golden Gate and Nassau's conduct, as alleged in detail above, was intentional, unjustified, and tortious.

190. Defendants acted in their own self-interest and to the detriment of Plaintiffs. Although Defendants' scheme lasted nearly a decade, Defendants interference was not complete until the Superior Court entered the Moratorium Order on May 20, 2024, which placed a $300,000 cap on death benefit claims for all life-insurance policies issued by PHL, including Plaintiffs' policies, irrespective of the amount of coverage applied-for and the corresponding premium payments made to keep that coverage in effect since the issuance of each policy.

191. Plaintiffs are entitled to recover all damages allowable by law, including but not limited to, the face value of their respective policies as applied-for, attorneys' fees, punitive damages, and such other relief as the Court deems just and proper. Plaintiffs are entitled to a judgment against Defendants, jointly and severally.

**COUNT II**
**FRAUDULENT MISREPRESENTATION AND CONCEALMENT**
**(Against All Defendants)**

192. Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

193. As alleged in detail above, from in or about 2016 through and including in or about 2024, Defendants, acting through PHL, made multiple false representations to Plaintiffs and insurance regulators located in Connecticut, including but not limited to:

(i) Nassau and Golden Gate had no plans to liquidate any of PHL's assets or to merge or consolidate any of those assets with any person or persons or to make any other material change in PHL's business operations or corporate structure or to enter into material agreements, arrangements, understandings or transactions of any kind with any party;

(ii) Nassau and Golden Gate intended to operate PHL in a manner similar to how PHL was operated prior to the acquisition by Nassau and Golden Gate;

(iii) Nassau and Golden Gate implemented the Buyback Program to "de-risk the UL block of business, providing significant benefits to [PHL] and the broader organization";

(iv) Nassau and Golden Gate directed PHL to purchase reinsurance from Concord Re to lower PHL's risk profile and improve its financial position;

(v) Nassau and Golden Gate directed PHL to engage in good-faith arm's-length commercial transactions and investments for the benefit of PHL; and

(vi) Plaintiffs would receive the full benefits under their insurance policies if Plaintiffs paid their insurance premiums as originally agreed in their policy agreements and pursuant to the increased COI rates charged to Plaintiffs thereafter.

194. These representations were false because Defendants materially altered PHL's business model after acquiring PHL and drained PHL's assets as described above.

195. Defendants knew these representations were false, or acted with a reckless disregard for the truth of these representations, because Defendants are sophisticated institutional investors that formulated their scheme, described above, prior to the acquisition of PHL, which is why Defendants purchased PHL in the first place.

196. Defendants intended Plaintiffs to rely on these misrepresentations and act upon them by continuing to pay the premium on each policy, in lieu of receiving the cash value for each policy and seeking another life insurance policy with another carrier. Plaintiffs' reliance was an essential element of Defendants' scheme, or else Defendants would lose their reliable flow of liquid assets to misappropriate.

197. Plaintiffs did, in fact, rely on Defendants' misrepresentations as evidenced by the ongoing premiums Plaintiffs paid after those communications. Plaintiffs paid premiums in reliance on Defendants' misrepresentations and concealment of material facts.

198. As a direct and proximate result of Defendants' fraudulent misrepresentations and omissions, Plaintiffs have suffered substantial damages plus interest, fees, and costs.

199. Defendants' fraudulent misrepresentations, material omissions, and fraudulent concealment of material facts were outrageous, willful, wanton, and with a conscious disregard of the rights of others. Accordingly, Plaintiffs are entitled to punitive damages.

200. Plaintiffs are entitled to a judgment in their favor, and against Defendants, jointly and severally, and an award of damages, together with punitive damages, applicable interest, cost, attorneys' fees, and other damages to the fullest extent permitted by law, and any further relief that this Court deems just and proper.

**COUNT III**
**NEGLIGENT MISREPRESENTATION AND CONCEALMENT**
**(Against All Defendants and In the Alternative to Count II)**

201. Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

202. As alleged in detail above, from in or about 2016 through and including in or about 2024, Defendants, acting through PHL, made multiple false representations to Plaintiffs, including but not limited to:

(i) Nassau and Golden Gate had no plans to liquidate any of PHL's assets or to merge or consolidate any of those assets with any person or persons or to make any other material change in PHL's business operations or corporate structure or to enter into material agreements, arrangements, understandings or transactions of any kind with any party;

(ii) Nassau and Golden Gate intended to operate PHL in a manner similar to how PHL was operated prior to the acquisition by Nassau and Golden Gate;

(iii) Nassau and Golden Gate implemented the Buyback Program to "de-risk the UL block of business, providing significant benefits to [PHL] and the broader organization";

(iv) Nassau and Golden Gate directed PHL to purchase reinsurance from Concord Re to lower PHL's risk profile and improve its financial position;

(v) Nassau and Golden Gate directed PHL to engage in good-faith arm's-length commercial transactions and investments for the benefit of PHL; and

(vi) Plaintiffs would receive the full benefits under their insurance policies if Plaintiffs paid their insurance premiums as originally agreed in their policy agreements and pursuant to the increased COI rates charged to Plaintiffs thereafter.

203. These representations were false because Defendants materially altered PHL's business model after acquiring PHL and drained PHL of its assets, as discussed above.

204. Defendants knew or should have known that these representations were false because Defendants should have known that their persistent course of conduct which drained PHL of all its assets would result in PHL's rehabilitation, and PHL's inability to pay Plaintiffs' claims

as they became due. At no point did Defendants ever disclose to Plaintiffs, the public, or Connecticut insurance officials, that they intended to drain PHL's assets for their own personal gain or accurately disclose PHL's financial condition.

205. Defendants intended Plaintiffs to rely on these misrepresentations and act upon them by continuing to pay the premium on each policy, in lieu of receiving the cash value for each policy and seeking another life insurance policy with another carrier.

206. Plaintiffs did, in fact, rely on Defendants misrepresentations as evidenced by the ongoing premium each of the Plaintiffs paid. But for Defendants' misrepresentations and material omissions and concealment of facts, Plaintiffs never would have continued paying premium.

207. As a direct and proximate result of Defendants' negligent misrepresentations and omissions, Plaintiffs have suffered substantial damages plus interest, fees, and costs.

208. Plaintiffs are entitled to a judgment in their favor, and against Defendants, jointly and severally, and an award of damages, applicable interest, cost, attorneys' fees, and other damages to the fullest extent permitted by law, and any further relief that this Court deems just and proper.

**COUNT IV**
**CIVIL CONSPIRACY**
**(Against All Defendants)**

209. Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

210. Defendants conspired and agreed to acquire PHL for the purpose of draining PHL's assets, including the funds necessary to pay valid claims of Plaintiffs, for the benefit of Defendants and Defendants' executives, as detailed above. Specifically, Defendants agreed to and worked together to extract as much money as possible from PHL through their self-proclaimed partnership from in or about 2015 through and including in or about 2024 via various transaction tactics that

directly caused PHL to lack the funds necessary to pay its policyholders, including Plaintiffs (as detailed above).

211. Defendants are a combination of two or more persons. Golden Gate is private-equity investment fund with over $20 billion of assets under management, including ownership and control of at least 21 companies, including the Nassau Defendants. Golden Gate is controlled by its founder, David Dominik. Nassau Financial's primary business is private equity and asset management, whereas Nassau Holding's primary business is insurance.

212. Defendants committed many unlawful and overt acts in furtherance of their conspiracy to defraud Plaintiffs. Such overt acts included, but are not limited to, (1) Golden Gate forming Nassau and directing the operations of PHL after its acquisition through common officers and directors and (2) Nassau causing PHL to engage in the Buyback Program and other transaction with shell entities formed by Golden Gate and/or Nassau. Defendants defrauded Plaintiffs into continuing to pay premiums after Defendants' acquisition of PHL and tortiously interfered with Plaintiffs' existing policy contracts with PHL. Defendants knowingly and intentionally concealed PHL's failing financial status from Plaintiffs, who continued to pay premium payments to support the coverage of their respective policies as contracted-for.

213. Defendants' conduct was intentional, coordinated, and undertaken with knowledge that the impact of PHL's descent into rehabilitation proceedings would fall not on themselves, but directly on the shoulders of legitimate policyholders like Plaintiffs.

214. As a direct and proximate result of Defendants' conspiracy, Plaintiffs have paid premiums to keep their respective policies in-force without receiving the full benefit of their contracts with PHL.

215. Plaintiffs are entitled to recover all damages allowable by law, including but not limited to, the face value of their respective policies as applied-for, attorneys' fees, punitive damages, and such other relief as the Court deems just and proper. Plaintiffs are entitled to judgment against Defendants, jointly and severally.

## COUNT V
## AIDING AND ABETTING
**(Against All Defendants)**

216. Plaintiffs hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

217. From in or about 2016 through and including in or about 2024, Defendants, individually and collectively, knowingly provided substantial assistance to one another in committing the underlying tortious conduct described herein, including, without limitation, tortious interference with contractual relations and fraudulent misrepresentation and concealment.

218. Each Defendant had actual knowledge of the wrongful nature of the scheme to extract liquidity from PHL at the expense of policyholders, including Plaintiffs. This knowledge is evidenced by, among other things, Defendants' central role in designing, directing, approving, and implementing the transactions described herein in a way that concealed the true nature and intent of the transactions—that is, to funnel PHL funds to Defendants and out of the reach of PHL policyholders like Plaintiffs.

219. Golden Gate possessed actual knowledge of Nassau's and PHL's wrongful conduct and substantially assisted that conduct by, *inter alia*:

(a) forming and capitalizing Nassau for the purpose of acquiring PHL;

(b) installing and directing Nassau executives who controlled PHL's operations;

(c) approving the Buyback Program (and the associated Sham Loans) and the use of affiliated entities, including DSM Sands and Westgate, to effectuate that program;

(d) directing the investment of PHL assets into Nassau-controlled investment vehicles; and

(e) approving and benefiting from the extraction of fees, dividends, and other payments generated by the scheme.

220. Nassau likewise possessed actual knowledge of the wrongful conduct and substantially assisted that conduct by, *inter alia*:

(a) exercising operational control over PHL and its board of directors;

(b) causing PHL to enter into non-arm's-length transactions with affiliated entities;

(c) structuring and executing the Sham Loans used to fund the Buyback Program;

(d) directing PHL to invest policyholder premiums into affiliated, illiquid, and high-risk investment vehicles managed by Nassau affiliates;

(e) orchestrating the captive reinsurance arrangements designed to conceal PHL's insolvency and transfer assets offshore; and

(f) causing PHL to make excessive fee payments and dividends to affiliated entities.

221. Defendants' assistance to one another was substantial. Defendants operated in concert through a web of affiliated entities, each of which played a necessary role in effectuating the scheme. *See, e.g.*, Exhibit 1. Without such coordinated assistance, the scheme could not have succeeded.

222. Defendants' conduct went well beyond passive ownership or ordinary corporate governance. Instead, each Defendant affirmatively participated in, directed, and facilitated the wrongful acts described herein.

223. Defendants provided such assistance with the intent to advance the underlying misconduct, and with conscious disregard of the substantial likelihood that their conduct would harm PHL policyholders, including Plaintiffs.

224. As a direct and proximate result of Defendants' aiding and abetting of one another's wrongful conduct, Plaintiffs suffered damages, including but not limited to, the face value of their respective policies as applied-for.

225. Defendants are jointly and severally liable for the damages resulting from their concerted misconduct.

226. Plaintiffs are entitled to recover all damages available under law, including compensatory damages, punitive damages, attorneys' fees, costs, and such other and further relief as the Court deems just and proper.

## COUNT VI
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(c))
**(Against All Defendants)**

227. Plaintiffs hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

228. Each Defendant is a person within the meaning of 18 U.S.C. § 1961(3).

229. Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

***The RICO Enterprise***

230. Defendants orchestrated their scheme to drain PHL of its assets and defraud Plaintiffs of the full, contracted value of their insurance policies through the acquisition, creation, and control over several shell entities and related subsidiaries whom they own and control (or owned and controlled), including (i) PHL Delaware LLC, (ii) DSM Sands LLC (formerly JOG Works LLC), (iii) Westgate Delaware LLC (formerly Lifebrook Designated Activity Company), (iv) Concord Re, (v) Palisado Re, (vi) Nassau Companies of New York (formerly Phoenix Companies), (vii) NAMCO, (viii) Nassau Corporate Credit, (ix) NCC CLO Manager, (x) Nassau

Private Credit, (xi) Nassau Alternative Investments, (xii) Nassau Re Cayman, (xiii) Phil Gass, (xiv) David Dominik, and (xv) Kostas Cheliotis (together with Defendants, the "Enterprise"). *See* Exhibit 1.

231. The Enterprise is an association-in-fact enterprise under 18 U.S.C § 1961(4) engaged in interstate commerce. It possesses an ascertainable structure separate and apart from the predicate acts themselves, including ongoing relationships among Defendants and the affiliated entities they created, controlled, and used to carry out the scheme. The Enterprise utilized its sufficient organization, continuity, and longevity to pursue its common purpose over a period of years, including through affiliate loans agreements, investment transactions, dividend payments, reinsurance transfers, and fund transfers. The Enterprise's activities and transactions relating to predicate RICO acts (described below) involved the interstate actions of Defendants, which affected interstate commerce, and frequently required use of wire or other electronic means and mail across state lines.

232. The Enterprise pursued a common purpose: to extract PHL assets for the ultimate benefit of Defendants and Defendants' executives, at the expense of PHL policyholders like Plaintiffs. Defendants and the affiliated entities associated with the Enterprise functioned as a continuing unit, with each participant performing distinct but coordinated roles in executing the scheme and concealing its effects from regulators and policyholders. The purpose of the Enterprise was to create and perpetuate the artifice of an apparently solvent insurer, thereby inducing Plaintiffs to continue paying premiums for full-value policies while Defendants withdrew from PHL the assets necessary to fund the death benefits contracted for in Plaintiffs' policies.

233. In establishing the Enterprise, the Defendants intended to use PHL to funnel its assets (including premiums continuing to be paid by policyholders) to other members of the

Enterprise—all the while funding the other members of the Enterprise via sham loans from PHL itself. The Defendants knew and understood that this structure would harm PHL's legitimate policyholders, including Plaintiffs, by leaving PHL without sufficient reserves, but they promoted the Enterprise's goal to enrich Defendants to the detriment of policyholders.

***Pattern of Racketeering Activity***

234. The Enterprise's scheme to defraud began in or about 2015 and continued at least until Connecticut insurance officials petitioned PHL into rehabilitation in or about May 2024.

235. At all times material to the Complaint, Plaintiffs were engaged in interstate commerce as to their insurance policies with PHL because there were regular and routine exchanges of mails and wires regarding the statuses of the policies and the transmission of premiums.

236. For at least eight years, each Defendant knowingly conducted or participated in the operation of the Enterprise and directed the Enterprise's affairs by participating in the management of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c). To the extent known, that pattern included multiple related acts of mail and wire fraud and money laundering (as described above), including but not limited to:

237. **Predicate Act Category 1: Golden Gate Acquired PHL via Misrepresentations to the Connecticut Insurance Commissioner, in Violation of 18 U.S.C. §§ 1341, 1343 (Mail Fraud/Wire Fraud)**

(i) On March 15, 2016, Golden Gate and Nassau filed their amended and restated Form A Application that included multiple misrepresentations, including that (i) Nassau and Golden Gate had sufficient experience managing insurers, (ii) Nassau and Golden Gate had no plans to liquidate any of PHL's assets or to merge or consolidate any of those assets with any person or persons or to make any other material change in PHL's business operations or corporate structure or to enter into material agreements, arrangements, understandings or transactions of any kind with

any party, and (iii) after the transaction was complete, Nassau and Golden Gate intended to operate PHL in a manner similar to how PHL was operated in the past. None of these representations were true.

(ii) The statements in the Form A Application caused by Golden Gate and Nassau were intended to deceive the Connecticut Insurance Commissioner and Plaintiffs regarding Defendants' ultimate scheme to siphon assets from PHL and its policyholders, including Plaintiffs, and to permit the Defendants to acquire Phoenix and PHL and thereafter drain the assets of PHL through specific impermissible tactics. Discovery will likely show that the Form A Application was submitted using the mail and/or wires.

(iii) In June 2016, Golden Gate purchased Phoenix and PHL for $217.2 million through an interstate wire from California to Connecticut. This was the first and necessary step of Golden Gate and Nassau's scheme to extract PHL's assets for Defendants' own personal benefit and at the expense of Plaintiffs, and was undertaken in furtherance of Defendants' fraudulent plan to exploit PHL's assets.

238. **Predicate Act Category 2: Use of Mails and Wires to Policyholders to Defraud Plaintiffs, in Violation of 18 U.S.C. §§ 1341 & 1343 (Mail Fraud/Wire Fraud)**

(i) In August 2016, Defendants caused PHL to send policyholders, including Plaintiffs, a letter through the United States mail stating that future PHL financial statements would be prepared in accordance with statutory accounting principles (STAT) and that "the [Nassau] acquisition of Phoenix does not change your contract's terms or conditions."

(ii) Defendants thereafter transmitted recurring premium-notice letters and related communications to policyholders through the mails and wires, each of which reinforced the false representation that policyholders would receive the benefit of their bargains if they continued paying premiums.

(iii) These communications and representations to policyholders were in furtherance of Defendants' scheme to defraud the policyholders of the full value of their death benefits because these correspondence concealed Defendants' pillaging of PHL's resources and continued to infuse revenues into PHL from premium payments.

(iv) These communications were also knowingly deceptive because Defendants materially altered PHL's business model upon acquiring PHL, as discussed above.

239. **Predicate Acts Category 3: Use of Wires to Purchase STOLI Policies with PHL's Own Assets, In Violation of 18 U.S.C. §§ 1341 & 1343 (Mail Fraud/Wire Fraud)**

(i) In 2017, Defendants, through their direction of PHL and through the Sham Loans, caused the transfer of $150 million from PHL (via interstate wires) into newly-

created shell entities wholly owned by Nassau—Westgate and DSM Sands—for Westgate to purchase PHL's previously issued STOLI policies for the ultimate benefit of Defendants, as discussed above.

(ii) Defendants caused PHL to characterize this asset transfer as a loan, but the Defendants had no intention for Westgate or DSM Sands to repay the funds. In fact, the Sham Loans were never repaid.

(iii) These wire transfers were accomplished in furtherance of Defendants' scheme to disguise the drain of PHL's assets for their own personal gain and to the detriment of PHL policyholders like Plaintiffs.

240. **Predicate Acts Category 4: Extracting PHL Assets to Fund Nassau CLOs and Collect Fees and Commissions, In Violation of 18 U.S.C. § 1343 (Wire Fraud)**

(i) Between 2017 and 2024, Defendants caused PHL to funnel PHL's assets to Nassau CLOs over interstate wires in the Cayman Islands, including Nassau 2017-1 Ltd., and a host of other Nassau CLO's including but not limited to, Nassau 2018-I Ltd., Nassau 2018-II Ltd., Nassau 2019-II Ltd., Nassau 2020-I Ltd., Nassau 2022-I Ltd., (Nassau CLOs), in the following cumulative amounts per year (shown as total invested in millions of dollars):

| | *2017* | *2018* | *2019* | *2020* | *2021* | *2022* | *2023* | *2024* |
|---|---|---|---|---|---|---|---|---|
| **Nassau CLOs (Total Invested)** | *36.5* | *87* | *112.2* | *131.6* | *170.1* | *171* | *222.3* | *189.1* |

(ii) The interstate wire transfers to fund Nassau CLOs were done as part of the scheme to defraud Plaintiffs and for the benefit of Defendants because transactions increased the value of Nassau's riskiest alternative investment vehicles owned, directly or indirectly, by Nassau and Golden Gate, while at the same time, Nassau executives received substantially above-market fees, commissions, and spreads on these trades.

(iii) Relatedly, Defendants' executives (controlling PHL) forced PHL to pay the following to Nassau Asset Management (NAMCO), each year between 2018-2024 (shown below in millions of dollars):

| | *2017* | *2018* | *2019* | *2020* | *2021* | *2022* | *2023* | *2024* |
|---|---|---|---|---|---|---|---|---|
| **Investment Fees paid to NAMCO** | *5.8* | *9.3* | *14.3* | *13.6* | *12.8* | *10.6* | *8.6* | *7.4* |

(iv) Each time PHL funded Nassau CLOs with millions of dollars of PHL assets, it was accomplished through interstate wires from PHL (Connecticut) to Nassau CLO Manager (Delaware) to the Nassau CLOs in the Cayman Islands, which were done in furtherance of Nassau's and Golden Gate's scheme to loot PHL's assets for their own benefit. The fees and commissions paid to NAMCO were also accomplished via interstate wires, from PHL (Connecticut) to NAMCO (Delaware).

241. **Predicate Acts Category 5: Transmission of Funds to and from the United States and Cayman Islands in Order to Promote Defendants' Fraud Scheme, In Violation of 18 U.S.C. § 1956(a)(2) (International Money Laundering).**

(i) Defendants have, on multiple occasions, directed or caused the transportation, transmission, and/or transfer of funds from the United States to or through a place outside the United States (or vice versa) with an intent to promote the carrying on of unlawful activity in violation of 18 U.S.C. §§ 1341 and 1343:

(ii) Between 2017 and 2024, Defendants' executives caused the transport, transmission, or transfer PHL funds ranging from $36.5 million to $222.3 annually from the United States to Nassau CLOs in the Cayman Islands, including Nassau 2017-1 Ltd., and a host of other Nassau CLO's including but not limited to, Nassau 2018-I Ltd., Nassau 2018-II Ltd., Nassau 2019-II Ltd., Nassau 2020-I Ltd., Nassau 2022-I Ltd., (Nassau CLOs).

(iii) Via the Subscription Agreement, Defendants caused funds to be transferred to and from Nassau Re Cayman in order to conceal Westgate's undercapitalization, maintain the ruse that the Sham Loans issued by PHL would be repaid, and sustain the Buyback Program.

(iv) These funds were transferred with an intent to promote the carrying on of Defendants' fraudulent scheme to drain assets from PHL and Plaintiffs.

242. **Predicate Acts Category 6: Extracting PHL Assets to Fund Nassau CFO, In Violation of 18 U.S.C. § 1343 (Wire Fraud).**

(i) Between 2019 and 2024, Defendants' executives (by directing PHL) extracted PHL's assets to fund their own CFO called Nassau 2019 CFO, LLC, over interstate wires. Defendants extracted PHL's capital during this time period to fund equity interest and "Class B Notes" in Nassau CFO, as shown below (in millions of dollars):

| | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** |
|---|---|---|---|---|---|---|
| **Equity Interest in Nassau CFO** | *11.3* | *28.9* | *26.9* | *13.9* | *10.8* | *9.7* |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Class B Notes Issued by Nassau CFO** | *8.3* | *14.6* | *14.6* | *13.8* | *10.3* | *7.2* |

(ii) Each wire transfer from PHL to fund the Nassau CLO or its Notes is an interstate wire accomplished (from Connecticut to Delaware / Cayman Islands) in furtherance of the scheme to extract as much capital from PHL as possible, and each is a predicate act. Nassau and Golden Gate executives also directed and received fees and spreads in connection with these investments as well via wire transactions.

243. **Predicate Acts Category 7: Extracting PHL Assets to Fund Nassau's other Private Equity Businesses, In Violation of 18 U.S.C. § 1343 (Wire Fraud).**

(i) Between 2019-2022, Defendants' executives (by directing PHL) extracted over $25 million of PHL capital to fund Nassau's newly-created private-equity subsidiary, Nassau Private Credit (Delaware), for the benefit of Nassau and Golden Gate. Each of these wires was interstate and done in furtherance of the scheme to defraud, and each was a predicate act.

244. **Predicate Acts Category 8: Extracting PHL Assets to Fund Nassau's own Bonds, In Violation of 18 U.S.C. § 1343 (Wire Fraud).**

(i) Between 2019-2020, Defendants' executives (by directing PHL) extracted over $10 million of capital from PHL to fund Nassau's own bonds, which they sold in 2021 for a 42% loss. Each of these wire transfers was interstate (Connecticut to Delaware), and done in furtherance of Defendants' scheme to extract PHL liquidity to fund Nassau's separate businesses, and was accomplished for the direct benefit of Nassau and Golden Gate

245. **Predicate Acts Category 9: Extracting PHL Assets to Fund Nassau Subsidiaries Under Services Agreement, In Violation of 18 U.S.C. § 1343 (Wire Fraud).**

(i) Between 2016 and 2024, Defendants' executives (by directing PHL) forced PHL to pay substantially above-market fees to Nassau subsidiaries, acting as service providers.

(ii) Between 2016 and 2024, Nassau extracted an average of $41.7 million a year in PHL assets that went directly to NCNY (Delaware) and Nassau Life (New York), and directly benefited Defendants. These fees were well above-market, and the service agreements were not arm's length transactions: They were a way for Nassau and Golden Gate to extract additional capital from PHL through interstate wires in furtherance of the Nassau and Golden Gate's scheme. Each payment (made on an annual or semi-annual basis) is a separate predicate act.

246. **Predicate Acts Category 10: Payment of Extraordinary Dividends, In Violation of 18 U.S.C. § 1343 (Wire Fraud).**

(i) In 2018, Defendants caused PHL to pay an extraordinary dividend in the amount of $60 million from Nassau Life to PHL's former parent company, NCNY.

(ii) And in 2019, Defendants caused PHL to pay an extraordinary dividend of $48 million from PHL (Connecticut) to its shell parent company, PHL Delaware (Delaware), which was wholly owned and controlled by Nassau.

(iii) These dividends ultimately benefited Nassau and Golden Gate and their executives, and were each accomplished through interstate wires executed in furtherance of the scheme, and each was an independent predicate act.

247. **Predicate Acts Category 11: Sham Reinsurance, In Violation of 18 U.S.C. § 1343 (Wire Fraud).**

(i) Beginning in 2019, Defendants caused PHL to cede PHL's liability to a domestic reinsurer (Concord Re) and then further retroceded those liabilities to an offshore unauthorized reinsurer in Cayman Islands, specifically, Nassau Re Cayman. Defendants caused PHL to send over $2 billion of liquid assets to Concord Re and then, subsequently, to the Cayman Islands between 2019 and 2023. Each interstate wire transfer was a predicate act in furtherance of Defendants' scheme and for the direct benefit of Defendants, as discussed above.

248. **Predicate Acts Category 12: Defendants Directed PHL to Impose COI Premium Increases in Order to Continue the Flow of Funds into PHL to Continue Defendants' Scheme, in violation of Violation of 18 U.S.C. §§ 1341 & 1343 (Mail Fraud/Wire Fraud).**

(i) In August 2017 and November 2020, under the direction of executives of Defendants, PHL imposed premium rate increases in order to further their scheme to deprive policyholders, including Plaintiffs, of the full value of their policies.

(ii) In furtherance of that scheme, Defendants directed PHL to notify policyholders, including Plaintiffs, of these COI increases as if the increases were not necessary due to Defendants' own actions, thereby misleading Plaintiffs, concealing the scheme and allowing the scheme to continue. Defendants used or caused the use of the U.S. mail on or about August 21, 2017 and November 2, 2020 to send the above-mentioned letters to Plaintiffs.

249. The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

250. The allegations above outline the timing, methods, and parties to the scheme to drain PHL of its assets and to defraud Plaintiffs of the value of their policies and the acts in furtherance of the Defendants' scheme. These acts, which were multi-faceted and carried out over years, were perpetrated by the Defendants and other entities in the Enterprise for the overarching purpose of illegally benefiting the Defendants by extracting funds from PHL to the extent that PHL could no longer meet its claim benefit obligations to its policyholders.

251. Defendants have directly and indirectly conducted and participated in the conduct of the Enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

252. The conduct and participation of each Defendant, as set forth above, involved:

253. Golden Gate, Nassau Holdings, and Nassau Financial each owned and/or controlled, directly or indirectly, each of the members of the Enterprise and had knowledge of, approved of, consented to, and/or directed the conduct of the Enterprise through a pattern of racketeering.

254. Defendants knowingly, intentionally, and regularly used interstate wires and mail (described above) for the purpose of extracting PHL's assets for their own benefit and as part of a scheme to defraud PHL policyholders like Plaintiffs of the value of their life insurance policies. Defendants use of interstate wires and interstate mail was essential to their scheme to defraud and/or was incident to essential parts of their scheme to defraud, and constitute a pattern of racketeering.

255. Defendants' multiple acts of racketeering occurred within ten (10) years of one another, were conducted with a specific intent to defraud Plaintiffs and did, in fact, defraud Plaintiffs, and occurred over the course of approximately nine (9) years between April 2015 and May 2024, within the meaning of 18 U.S.C. § 1961(5).

256. Plaintiffs have been injured as a direct and proximate result of Defendants' participation in and conduct of racketeering activities and violations of 18 U.S.C. § 1962(c). Defendants' racketeering activity foreseeably and directly caused Plaintiffs to continue paying premiums for policy benefits that Defendants rendered unavailable in full because Defendants stripped PHL of the liquidity necessary to satisfy those obligations as they came due.

257. Plaintiffs seek remedies including compensatory damages including, but not limited to, the face value of their respective policies as applied-for, together with premiums paid in reliance on Defendants' fraudulent scheme, plus treble damages pursuant to 18 U.S.C. § 1964(c), reasonable attorneys' fees, as well as such further relief as the Court deems appropriate.

258. Plaintiffs are entitled to judgment in their favor, and against Defendants, jointly and severally, and an award of damages to the fullest extent permitted by the law.

## COUNT VII
## CONSPIRACY TO VIOLATE THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(d))
**(Against All Defendants)**

259. Plaintiffs hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein.

260. In the commission of the acts of racketeering set forth in Count VI, each Defendant knowingly and intentionally conspired, agreed, and acted together in concert and with others to perpetuate the scheme to defraud (discussed above). Each Defendant substantially assisted, caused, or encouraged each other and/or others in the achievement of the Enterprise's scheme to defraud.

261. Specifically, beginning in or about April 2015, Defendants agreed to extract PHL's assets for their own benefit, as discussed above.

262. In furtherance of this conspiracy, each Defendant was aware of the fraudulent nature and scope of the Enterprise, as alleged herein, and agreed to the commission of, or participated in, at least two of the acts of racketeering set forth in Count VI, or to otherwise facilitate the fraudulent schemes, and agreed to violate 18 U.S.C. § 1962(c).

263. Defendants agreed and conspired to conduct the affairs of the Enterprise through a pattern of racketeering activity as described herein, in violation of 18 U.S.C. § 1962(c). Defendants conspired to violate 18 U.S.C. § 1962(c), which conduct violates 18 U.S.C. § 1962(d).

264. Plaintiffs have been injured as a direct and proximate result of Defendants' conspiracy, participation, and conduct in the Enterprise. As a result of Defendants' conduct, PHL cannot now satisfy its obligations to Plaintiffs as they become due.

265. Plaintiffs seek remedies including compensatory damages, including but not limited to, the amount of their respective policies as applied-for, attorneys' fees, punitive damages, and such other relief as the Court deems appropriate.

266. Plaintiffs are entitled to judgment in their favor and against Defendants, jointly and severally, and an award of damages to the fullest extent permitted by the law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the putative Class, respectfully request that this Court enter judgment against Defendants, jointly and severally, and award the following relief:

(a) Certification of the proposed Class;

(b) Damages in an amount to be determined at trial, including actual, multiple, statutory, punitive, treble, and/or enhanced compensatory damages;

(c) Disgorgement and restitution of all inflated premium rates paid by Plaintiffs and the Class as a result of Defendants' conduct alleged herein;

(d) Pre- and post- judgment interest at the maximum rate permitted by applicable law;

(e) Attorneys' fees, costs, and expenses as available by law;

(f) Such other and additional relief as the Court may find just and equitable.

DATED: September 25, 2026

**COZEN O'CONNOR**

________________________
Jonathan M. Ciriello (Conn. Bar. No. 31551)
Michael J. Miller (*pro hac vice forthcoming)*
Gregory J. Star (*pro hac vice forthcoming)*
Stephen A. Miller (*pro hac vice forthcoming*)
Nicolas A. Novy (*pro hac vice forthcoming)*

1650 Market Street, Suite 2800
Philadelphia, PA 19103
215-665-2000 (phone)
jciriello@cozen.com
mjmiller@cozen.com
gstar@cozen.com
samiller@cozen.com
nnovy@cozen.com

Karen D. Williams (*pro hac vice forthcoming*)
Samantha R. Stratford (*pro hac vice forthcoming*)
Joseph Simpson (*pro hac vice forthcoming*)
2001 M Street NW, Suite 500
Washington, DC 20036
202-918-4200 (phone)
kwilliams@cozen.com
sstratford@cozen.com
josephsimpson@cozen.com

*Attorneys for Plaintiffs*